**William R. SHERWIN, d/b/a Sherwin Electric Service**

v.

**The UNITED STATES.**

No. 299–68.

United States Court of Claims.

Jan. 22, 1971.

Irvin Grant, Los Angeles, Cal., attorney of record, for plaintiff.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS and SKELTON, Judges.

ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Franklin M. Stone with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on June 2, 1970, wherein such facts as are necessary to the opinion are set forth. Defendant requested review by the court of the commissioner's opinion and recommended conclusion of law. Plaintiff urged that the court approve and adopt his opinion and recommended conclusion of law. The case has been submitted to the court on oral argument of defendant's counsel and the briefs of the parties. Since the court agrees with the opinion and recommended conclusion of the trial commissioner, with minor modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiff's motion for summary judgment is granted, defendant's cross-motion is denied, and judgment is entered for plaintiff in the sum of $11,500.63.

Commissioner Stone's opinion, with minor modifications by the court, is as follows:

In this case, which is before the court on plaintiff's motion and defendant's cross-motion for summary judgment, the court is called upon to review, under the provisions of the Wunderlich Act,[1] decisions rendered by the Veterans Administration Contract Appeals Board (VA CAB),[2] denying plaintiff's request for a compensatory change order, and an equitable adjustment for additional costs and expenses assertedly incurred in the performance of a contract for the installation of an emergency electrical system at the Veterans Hospital in Fresno, California.

The contract, No. V5202C–60, was awarded to plaintiff on May 12, 1965, by

1. 68 Stat. 81, 41 U.S.C. § 321, 22 (1964).

2. VACAB, Docket No. 563, dated January 31, 1968, 68–1 BCA ¶6843, and supplementary decision dated July 29, 1968, 68–2 BCA ¶7147, denying plaintiff's motion for reconsideration (hereinafter collectively referred to in the singular term "decision"). Unless specifically stated otherwise, all citations herein to the opinion of the Board refer to its January 31, 1968 decision.

defendant, acting through the Veterans Administration. The total contract price was $98,490. The contract contained, among other provisions, the standard "Disputes" and "Changes" clauses customarily included in Government contracts.

An essential item of the contract was an automatic transfer switch which, in the event of a lowering or loss of current from the normal source, could activate an emergency stand-by generator, disconnect the hospital electrical system from the normal source, and then reverse the switching sequence upon the reestablishment of adequate power from the normal source.

In brief, the controversy between the parties arises out of the undisputed fact that subsequent to the purchase by plaintiff of a certain type of automatic transfer switch, previously approved by defendant for use in performing the contract, the Government withdrew its approval of the switch in question as not meeting the contract specifications, thereby necessitating the purchase by plaintiff of another type of switch.

After purchasing and installing a second switch approved by the Government, plaintiff made a request for a change order and claimed reimbursement for asserted resultant increased costs in the amount of $11,500.63. Plaintiff's claim was denied by the contracting officer on April 5, 1966, and plaintiff appealed the decision to the VACAB (hereinafter sometimes referred to as the "Board") which, after a hearing, affirmed the action of the contracting officer and denied plaintiff's appeal. See fn. 2, *supra*. Thereafter, plaintiff instituted suit in this court by a petition filed October 7, 1968.

Plaintiff's petition and motion for summary judgment assert, in substance, that the Board's decision is contrary to the agreement of the parties, arbitrary, and capricious; that it contains factual findings that are not supported by substantial evidence; and that it is erroneous as a matter of law. Defendant contends that plaintiff's claim has no merit

and should be denied, and that plaintiff's petition should be dismissed.

After reviewing the pleadings, administrative record, and briefs of the parties, it is concluded that the decision of the Board should be reversed and that plaintiff is entitled to recover.

Returning now to the contract, the specifications thereof described but did not identify by name, an automatic transfer switch manufactured only by the Automatic Switch Company (ASCO). The specifications directly related to the switch required under the contract contain, *inter alia*, the following pertinent provisions:

ELECTRICAL EQUIPMENT
SECTION 801

\* \* \* \* \* \*

801–22. AUTOMATIC TRANSFER SWITCH: Shall be an inherently double-throw switch interlocked mechanically and electrically and shall be operated by a simple overcenter type mechanism actuated by a single solenoid. Solenoid shall be energized momentarily during transfer period only. Operating current for transfer shall be obtained from the same source to which the load is to be transferred. Once transfer has been completed, the switch shall be mechanically locked in position without use of hooks, latches, or springs. Failure of any coil or disarrangement of any part shall not permit a neutral position where both sources are disconnected from the load. Transfer time in either direction shall not exceed $\frac{1}{6}$ second.

A. Voltage rating, current rating, and number of poles shall be as specified. Current rating shall be based on continuous duty, fully enclosed.

B. Main contacts shall be silver surfaced and protected by arcing contacts. Poles shall be equipped with arc barriers and magnetic blowouts.

C. Transfer switch shall be arranged to close pilot contact for remote starting of standby plant one

second after a drop in voltage on any phase of normal to 85% of rated voltage or less. Switch shall not transfer load to standby plant until voltage and frequency on generator has reached approximately 90% of rated valve. Upon restoration of normal source to not less than 90% of rated voltage on all phases, the load shall be retransferred to normal source after an adjustable, time delay of 5 to 25 minutes. After retransfer, timer shall permit standby plant to run 5 minutes before shutting down.

D. An auxiliary contact shall close an indicating circuit when load circuits are connected to emergency source.

E. Relays shall be heavy duty, industrial type with silver alloy contacts with a minimum rating of 10 amperes.

F. Contacts and coils shall be readily accessible for replacement from front of panel without major disassembly of associated parts.

G. The transfer switch shall include an automatic exerciser connected to simulate normal source failure for 15 minutes once every 168 hours.

Section 801–3, of the specifications, captioned "STANDARD PRODUCTS," states in part:

* * * Materials and equipment, unless otherwise required by drawings or specifications, shall be standard products of manufacturers regularly engaged in the production of such items. * * * The major components of assembled electrical equipment shall all be the products of one manufacturer, who shall assume responsibility for the entire assembled product.

Section 801–5 governing submittal requirements for electrical equipment reads in pertinent part:

801–5. SUBMITTALS: Before executing any work, submit in quadruplicate, in accordance with the Samples and Shop Drawings Section of the spec-

ifications, information sufficient to evidence full compliance with contract requirements on items proposed to be furnished. Such information shall include, as required, Manufacturers' Name, Trade Names, Model or Catalogue-Number, Name Plate Data (size, capacity, rating), and corresponding specification reference (Federal or project specification number and paragraph). Materials specified under this section of the specifications shall be submitted separately and apart from materials specified under other sections and shall be marked "SUBMITTED UNDER SECTION 801."

A. For equipment which has to be specially fabricated, shop drawings and detailed description shall be submitted.

Section S of the specifications, entitled "SAMPLES AND SHOP DRAWINGS," contains provisions reading in pertinent part as follows:

S–1. GENERAL: Submit for approval; samples, shop drawings, certificates and manufacturers' literature and data, as required under the separate sections of the specification, with information sufficient to evidence full compliance with contract requirements.

* * * * * *

(b) Approval or acceptance of items will not preclude rejection of any item upon discovery of defects in them prior to final acceptance of completed work.

* * * * * *

(e) Samples, shop drawings, certificates and manufacturers' literature and data will be reviewed for approval and action thereon will be presented in writing to Contractor by Contracting Officer.

S–2. SAMPLES, CERTIFICATES AND MANUFACTURERS' LITERATURE AND DATA:

(a) * * * Submit manufacturers' literature and data and certificates in quadruplicate except where a greater number is specified.

(b) * * * manufacturers' literature and data must be submitted by Contractor only and shipped prepaid.

(c) * * * manufacturers' literature and data will receive consideration only when covered by a transmittal letter signed by Contractor. * * *

* * * * * *

2. Any deviation from contract requirements shall be so stated in letter of transmittal.

* * * * * *

S–3. SHOP DRAWINGS:

(a) Shop, erection or setting drawings * * *

1. These drawings shall be stamped and signed by Contractor certifying to such check and must be accompanied by a letter of transmittal signed by Contractor.

2. A copy of this letter shall, at same time, be sent to Resident Engineer.

* * * * *

8. Veterans Administration's approval of such drawings will be subject to contract requirements and shall not relieve Contractor from responsibility for errors of any sort in shop drawings or for any unauthorized deviations from contract requirements.

9. Any deviations from contract requirements and justification therefor shall be so stated in the letter of transmittal.

* * * * * .

S–4. SHIPPING ADDRESS: Following items shall be sent to Resident Engineer, Veterans Administration Hospital, Fresno, California:

* * * * * *

(b) Manufacturers' literature and data in connection with Miscellaneous Construction, mechanical and electrical specification sections.

(c) Shop Drawings.

The Board's opinion recites that Mr. Frank J. Rock, plaintiff's Contract Manager, deposed to the effect that he exercised plaintiff's responsibility for selection of suitable materials and equipment to be incorporated into the contract work; that he analyzed the descriptive materials on automatic transfer switches manufactured by several companies, including ASCO and R. G. Russell Company (Russell), and concluded that there was no 1000 ampere transfer switch on the market that entirely conformed to the contract specifications; and, further, that in his opinion the Russell Company's product, referred to as the "Russelectric" switch, was, from a functional standpoint, the nearest to meeting the specifications.

Following the above conclusion and evaluation, plaintiff, on May 28, 1965, submitted to the Veterans Administration (VA) Resident Engineer for approval, manufacturer's data appropriately marked to show the specific transfer switch and accessories intended for installation under the contract. The letter of transmittal specifically referred to automatic transfer switch Russelectric Model #RMT1003CE.

As previously indicated, the Russelectric switch differed in certain respects from the specifications relating to this item of equipment. Despite these differences, which will be discussed in some detail later, the Resident Engineer, after examining the brochure and speaking with plaintiff's representative about the Russelectric switch, approved this type of switch by letter to plaintiff dated June 24, 1965, and its accessories by letter dated June 30, 1965, for use in performing the contract.

Thereafter, on July 7, 1965,[3] plaintiff, in reliance upon the Resident Engi-

---

3. The Board's opinion does not specify this date as the one on which plaintiff ordered the equipment in question; however, the record contains undisputed evidence that this was done on that date. Therefore, the date is stated as a fact. *See* Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 870, 181 Ct.Cl. 607, 631 (1967).

neer's approval of the Russelectric switch, ordered the fabrication and shipment, as soon as possible, of the equipment in question from the Russell Electric Company. Russell fabricated the switch and shipped it from Boston to plaintiff on August 10, 1965.

Meanwhile, certain events occurred which are recounted in a memorandum from the Resident Engineer to the contracting officer, dated August 3, 1965, quoted below:

1. An American Switch Company representative from San Francisco called me last Thursday, July 29, 1965, and appeared to express sentiments of displeasure over his understanding that "Russelectric" had gained acceptance under the terms of the contract as submitted by the contractor. His contention was that the accepted transfer switch gear did not comply with the contract specifications. My only remark was that I would surely discuss the matter with VA Construction Service.

2. My almost immediate response or reaction to the above was to consult Construction Service. On the same date, in my conversation with Construction Service, they advised Russelectric automatic switches did not meet the minimum specifications as provided on this contract. Because I had given my authorization to the contractor to use the particular material, Construction Service said that the equipment could not be installed on the job site and to give the contractor his notification accordingly. Moreover, ASCO switch apparatus was the only manufacturer that could meet the specifications under the contract.

3. By copy of this memorandum I am hereby reversing material authorization as approved in my memorandum to the contractor on June 24, 1965, subject to a supportive directive from Construction Service, stating ASCO contract acceptability. At this point, it is important Sherwin Electric not be advised in writing of this apparent nonacceptance of material as submitted.

4. To amplify on the previous sentence, yesterday Mr. Philpot, the Sherwin Electric Service field representative, was notified verbally not to proceed with the installation of said transfer switch until further notice.

Under date of August 12, 1965, the contracting officer sent to plaintiff a letter which reads in pertinent part:

In confirmation of telephone conversation of above date between your office and our Acting Resident Engineer, please be advised that our Central Office Engineering Service has disapproved your proposal to install a Russell automatic transfer switch since it fails to meet contract specifications as follows:

1. The Russell uses two breakers not inherently double-throw as required.

2. A simple overcenter type mechanism actuated by a single solenoid was specified, whereas Russell uses a mechanism actuated by a motor.

3. The specifications require the main contacts to be protected by arcing contacts; Russell does not have arcing contacts.

We trust the above explanation will clarify the need of this installation and enable you to furnish the type of transfer switch required under the contract.

By the time plaintiff was notified of the withdrawal of approval, the Russelectric switch already had been shipped to the job site by the manufacturer (Russell), and plaintiff was unable to cancel the order therefor. The equipment arrived at the job site on September 8, 1965. Not being able to return the switch to Russell for credit, plaintiff was forced to spend additional sums incident to the purchase and installation of a second switch manufactured by ASCO.

Since certain arguments advanced by defendant in support of its position con-

tain references to quoted portions of provisions of the contract other than those hereinbefore set forth, note is taken of these provisions at this point. Paragraph 10 of the General Provisions of the contract reads in pertinent part:

### 10. INSPECTION AND ACCEPTANCE

(a) Except as otherwise provided in this contract, inspection and test by the Government of material and workmanship required by this contract shall be made at reasonable times and at the site of the work * * *.

(b) The Contractor shall, without charge, replace any material or correct any workmanship found by the Government not to conform to the contract requirements, unless in the public interest the Government consents to accept such material or workmanship with an appropriate adjustment in contract price. The Contractor shall promptly segregate and remove rejected material from the premises.

Paragraph 21, Section G, of the General Conditions of the contract reads in pertinent part:

### 21. INSPECTION AND ACCEPTANCE

\* \* \* \* \* \*

(b) Final inspection and acceptance of work shown by drawings and specifications forming a part of this contract shall not be binding or conclusive upon the United States if it shall be shown (1) that the Contractor has willfully or through collusion with persons or firms engaged in the performance of the contract, or with an employee of the Federal Government, supplied inferior materials or workmanship, or (2) that the contractor has otherwise departed from the terms of the contract. The foregoing will not permit reliance upon any other legal basis for rejection. * * *

(c) Final inspection will not be made until the contract work is ready for beneficial use or occupancy. The Contractor shall notify the Contract-

ing Officer, through the Resident Engineer, fifteen (15) days prior to the date on which the work will be ready for final inspection. * * *

In connection with the above provisions, it should be noted that the record undisputably discloses that the Russelectric switch was rejected by the contracting officer upon instructions received by him from the Veterans Administration Central Office Engineering Service subsequent to the time the switch was shipped from the factory but before it arrived at the job site, and that the switch was never personally examined by the contracting officer or Resident Engineer, at least not before the switch was disapproved by the Government.

Plaintiff contends that the detailed description of the properties of the original automatic transfer switch set forth in Section 801–22 under the heading "ELECTRICAL EQUIPMENT," quoted *supra*, should be read to establish a "standard of quality" requiring only that a proffered deviation must function as well as the specified equipment. Plaintiff relies upon Paragraph 9 of General Provisions of the contract, which read in pertinent part as follows:

### 9. MATERIAL AND WORKMANSHIP

(a) * * * Unless otherwise specifically provided in this contract, reference to any equipment, material, article, or patented process, by trade name, make, or catalog number, shall be regarded as establishing a standard of quality and shall not be construed as limiting competition, and the Contractor may, at his option, use any equipment, material, article, or process which, in the judgment of the Contracting Officer, is equal to that named. * * *

The Board denied plaintiff's contention that the above Paragraph 9 was applicable, stating at p. 31,637–38 of its opinion:

Appellant erred in assuming that the narrowness of the specifications brought them within the intent of paragraph 9 of [the] General Provi-

sions * * * of the contract. These specifications did not include a trade or brand name, but described in considerable detail the transfer switch to be furnished. Paragraph 9, above, is expressly directed to situations where no such description is available and where it is necessary to substitute the use of the brand name for the description. This was not that kind of case. These specifications are clear and detailed and the Government is entitled to demand full compliance with them. * * * [ASBCA decision referred to and cases cited therein omitted.]

The Board, having refused to apply the standard of quality test, made no attempt to compare the relative performance standards of the Russelectric and the ASCO switches under the requirements of the contract. Rather, the Board simply reviewed the properties of the Russelectric switch to see whether they mirrored the proprietary characteristics of the ASCO switch as described in the specifications.

■ Whether the "or equal" or "standard of quality" clause contained in Paragraph 9, *supra,* was applicable is a question of law, and thus the prior administrative decision on this question is not binding on the court. Jack Stone Co. v. United States, 344 F.2d 370, 170 Ct.Cl. 281 (1965). *See also,* Dynamics Corp. of America v. United States, 389 F.2d 424, 182 Ct.Cl. 62 (1968). After a thorough review of the question, it is concluded and held that the Board erred as a matter of law in refusing to apply the standard of quality clause to this case; that the Russelectric switch came within the limitations of the standard of quality clause; and that the rejection of the Russelectric switch constituted a change in the contract for which plaintiff is entitled to an equitable adjustment in the amount of the increase in its performance costs.

Support for plaintiff's position that a detailed description of the proprietary characteristics of an item should be treated the same as if the brand-name itself were used, is found in the long-established policy against drafting specifications in ways which would tend to eliminate competition for the furnishing of items to be used in the performance of public construction contracts. As was observed by this court in *Jack Stone Co., supra,* 344 F.2d at 373–374, 170 Ct.Cl. at 287, the "standard of quality" clause

> * * * was designed to discourage the potentially monopolistic practice of demanding the use of brand-name or *designated* articles in government contract work. The framers of the clause obviously thought that it was in the national interest to widen the area of competition, and to bar local procurement officials from choosing a particular source either out of favoritism or because of an honest preference. * * * [Emphasis added.]

To effectuate the policy enumerated above, this court, the Comptroller General, and Boards of Contract Appeals have recognized that in applying the standard of quality clause, the description of an item by proprietary characteristics, found in the product of only one manufacturer, should be treated the same as if the item were identified by its trade name. Urban Plumbing & Heating Co. v. United States, 408 F.2d 382, 386 (n. 3), 187 Ct.Cl. 15, 23–24 (n. 3) (1969); 39 Comp.Gen. 101, 108 (1959); Comp.Gen.Dec.B–155826, January 21, 1965; Algernon Blair, Inc., GSBCA No. 2116, 67–2 BCA ¶ 6453; Kay-Cee Constr. Corp., VACAB No. 478, 65–1 BCA ¶ 4790. To hold otherwise would render the standard of quality clause readily circumventable. Under the Board's test, despite the presence of the standard of quality clause indicating free competition, it would be possible for a local procurement official to insert a detailed description of a manufacturer's product into the specifications and thereby largely defeat the purposes of the competitive bidding process. The suspicion of partiality could hardly be avoided. Such suspicion is heightened where, as in the instant case, it is the representative of the favored manufac-

turer who succeeds in having approval of a competitor's product withdrawn because of allegedly non-conforming properties.

At this juncture, it will be helpful to briefly review some of the experiences of this court and of various Boards of Contract Appeals, including the Veterans Administration Contract Appeals Board, in applying the standard of quality clause.

The leading case of *Jack Stone Co.,* *supra,* involved the specification for a fire alarm system which required Sperti Faraday equipment and parts. The contract also contained the same standard of quality clause found in the instant case. There this court held that

> * * * under this contract plaintiff was not required to furnish Sperti Faraday equipment alone, but could supply articles from another source if they were equal to Sperti Faraday and if the consent of the contracting officer was sought in advance. * * *
>
> [344 F.2d at 376, 170 Ct.Cl. at 290.]

The court went on to find that the major cases on which the defendant relied differed significantly in that rather than involving the application of the standard of quality clause, they simply held that the Government is entitled to get what the contract demands. Such is the situation in the instant case. In *Jack Stone,* the court then adopted the Board's negative finding that the record did not indicate that the substituted equipment was unequal or inadequate, and on that basis it awarded plaintiff an equitable adjustment under the Changes article because plaintiff was required to install Sperti Faraday equipment in the fire alarm system rather than the proposed equal equipment.

In the case of *Urban Plumbing & Heating Co., supra,* involving somewhat different issues, the court stated that the "or equal" provision of the standard of quality clause does not "mean that the proposed substitutes had to comply with every detail of the specifications (which were based on particular brands, without naming them). The 'or equal' clauses were designed to establish a 'standard of equality' and meant only that the proffered 'deviation' had to function as well as the specified equipment." 408 F.2d at 386 (n. 3), 187 Ct.Cl. at 24 (n. 3).

In *Algernon Blair, Inc., supra,* the General Services Board of Contract Appeals held that a construction contractor was entitled to reimbursement for certain costs which resulted from specifications which proved to be latently restrictive. The Board found that by the use of performance specifications, the Government subtly required installation of a specific patented boiler, thereby preventing the contractor from competitively utilizing the products of other manufacturers. After installing a different boiler, the contracting officer there required the contractor to perform substantial modifications. Holding that the contractor's installation was proper in view of the standard of quality clause, the Board found that the modification order constituted a constructive change and entitled the contractor to an equitable adjustment.

In *Kay-Cee Constr. Corp., supra,* the Veterans Administration Contract Appeals Board awarded the contractor an equitable adjustment for the improper rejection of a proposed nurse's call system under a contract calling for the installation of "a complete operating system to match existing equipment." In that case, the Board noted that an "or equal" "product is one which provides all the essential functions specified and is suitable to the actual needs of the Government, even though it may differ in some details from the product prescribed or referenced." *Id.* at p. 22,736.

From these cases, it is clear that in comparing a proposed substitute to a product described in the specifications, this court and at least some Boards of Contract Appeals tend to look beyond proprietary details to determine whether the substitute functions as well, in all essential respects, as the specified equipment.

As explained above, the Board made no findings as to the comparative functioning of the two automatic transfer

switches. Preliminary to this court's evaluating the proposal of the substitute in this case, it should be noted that normally where the administrative board has not made findings of fact, the court suspends its proceedings to enable the parties to return to the board so that initial findings can be made. United States v. Anthony Grace & Sons, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966). However, in the case of *Maxwell Dynamometer Co., supra*, fn. 3, this court stated:

> Where an administrative board has failed to make a relevant finding of fact as to which the evidence is undisputed, this court has made such finding rather than referring the matter to the board. * * * Likewise, where the evidence is disputed but it is of such a nature that as a matter of law the Board could have made only one finding of fact, it would seem that this court can make that finding without sending the matter back to the Board for determination of the factual issues; otherwise, litigation would be protracted and unnecessary delay and expense would result simply in order to have the Board formally decide a fact which legally can be decided in only one way. Such an empty ritual has no place in a rational decision-making process. [Footnote omitted.] [386 F.2d at 870, 181 Ct.Cl. at 631.]

*Accord,* Ray D. Bolander Co. v. United States, 186 Ct.Cl. 398, 409 (n. 11) (1968).

For this court to hold for plaintiff in the instant case, it is necessary to find that the nature of the evidence is such that one may say as a matter of law that (1) plaintiff, by way of submitting adequate information, proposed a substitute to that described in the specifications, and (2) that the proposed substitute came within the standard of quality represented by the specifications.

With regard to the procedural requirement of notice, it is important to understand that the Board dealt with this issue only in the context of its refusal to apply the standard of quality clause. The

Board held in its opinion, at pp. 31,636–37, as follows:

> The parties, by entering this contract, agreed that the Appellant would furnish and that the government would accept an automatic transfer switch with the particular features specified therein. By submitting manufacturer's data of a switch that did not comply with the contract specifications, it is apparent that Appellant desired to have the contract changed sufficiently to permit the installation of a different switch than was originally contemplated. The contract permitted the Contracting Officer to make such a change and set out a procedure that Appellant could follow in proposing such a change; namely, to submit the manufacturer's data with a letter of transmittal and "any deviation from contract requirements shall be so stated in letter of transmittal" (Specification Section S–2, paragraph (c) 2). Appellant did not follow this procedure in making the submission. The Appellant's failure to follow the specific procedure in proposing a deviation from contract may not of itself be fatal to its claim, if, in some other way, it is shown that the Government had actual knowledge that a contract change was being proposed or acted upon. It is our opinion that inherent in the contract requirement for specific notice of deviations from contract requirements is the substantive right of the contracting officer to have a conscious awareness that a proposed contract change is being tendered.

> Although verbal and written communications associated with the submission were exchanged between the parties at that time, Appellant does not contend nor does the evidence show that specific notice in addition to the manufacturer's data was given to the Government representatives. Appellant submits that the manufacturer's data itself clearly showed that the features of the switch proposed were different from those in the specifications. However, Appellant has not

shown and the evidence before the Board does not otherwise establish that the Government representatives were consciously aware that Appellant was proposing a change in the contract or what changes were being requested.

■ Inasmuch as the Russelectric switch was offered as conforming to, and not as deviating from, the contract requirements, the Board erred as a matter of law in placing a burden on the plaintiff to prove that the Government was "consciously aware" that a *change* was being requested.

The record clearly indicates that plaintiff gave the proper Government representative sufficient information from which one familiar with the contract must conclude that the Russelectric switch was proffered as a substitute, though an equal substitute, for the switch described in the specifications. On or before May 28, 1965, seven copies of a detailed brochure describing the properties of the Russelectric switch were sent to Mr. Weldy, the VA Resident Engineer, in accordance with specification S–4(b), *supra.* The brochure clearly described the properties of the switch which later came under attack as differing from the specifications, with the exception of the so-called "inherently double-throw" characteristic which the Government later admitted the Russelectric switch indeed possessed. In fact, explanations of the remaining two allegedly non-conforming properties were the subjects of italicized headings entitled *"The Motor Operated Mechanism"* and *"Inductive Load Arc Quenching."* The Resident Engineer had the brochure in his possession for nearly a month, spoke with plaintiff's representatives about the switch on two occasions, and is said to have "studied" the information closely before approving the switch for the contract.

The Government does not contend that the brochure contains misleading information, or that the existence of the so-called deviations is not readily apparent from the brochure. It does contend, however, by way of denying any binding effect from its approval, that the contract required the submittal of shop drawings along with the manufacturer's brochure. This contention must be examined since it contains at least the implicit allegation that the defendant was not given sufficient information regarding the allegedly non-conforming properties of the Russelectric switch.

■ Defendant asserts (1) that the automatic transfer switch constituted "fabricated" equipment within the context of the provisions of Paragraph 801–5 A, *supra,* of the contract, thereby requiring the submittal of shop drawings; (2) that even approval of such allegedly required but not submitted shop drawings would not relieve the contractor for responsibility for any unauthorized deviations from the contract requirements under Paragraph S–3(a)8, *supra,* and therefore, taken together, these provisions in the aforesaid paragraphs negate the contention that the approval of the contracting officer of the Russelectric switch should be binding on the Government. As in the *Jack Stone* case, *supra,* defendant's argument is simply that the Government is entitled to get what the contract demands. Such argument is not inconsistent with plaintiff's position that under the standard of quality clause, the Russelectric switch must be deemed to have met the contract demands.

The more relevant issue here is whether a requirement for the submittal of shop drawings existed, which, if true, could indicate that there might be insufficient information to evidence that the Russelectric switch complied with contract requirements. Certainly, the question of the applicability of Paragraph 801–5, *supra,* is a question of law as to which the Board's conclusion is not binding on this court. *Dynamics Corp. of America, supra.* From the following review of the relevant provisions of the contract, it is concluded that shop drawings were not required for the automatic transfer switch.

Paragraph S–1, *supra,* of the specifications dealing with "SAMPLES AND SHOP DRAWINGS" sets out under the

heading "General," requirements for submission of samples and shop drawings in terms clearly stating that the contractor is to submit for approval, "samples, shop drawings, certificates and manufacturers' literature and data, *as required under the separate sections of the specification*, with information sufficient to evidence full compliance with contract requirements." [Emphasis added.]

Section 801 of the specifications, mentioned hereinbefore, is the *separate section* specifically directed to "Electrical Equipment." Paragraph 801–3, *supra*, of the specifications, captioned "STANDARD PRODUCTS," states in part that "[m]aterials and equipment, unless otherwise required by drawings or specifications, shall be standard products of manufacturers regularly engaged in the production of such items. \* \* \*"

Paragraph 801–5, *supra*, of the specifications governing submittal requirements, provides that before executing any work, the contractor shall submit, in accordance with Section S of the specifications relating to "SAMPLES AND SHOP DRAWINGS," *supra*, "information sufficient to evidence full compliance with contract requirements on items proposed to be furnished. \* \* \*" Section 801–5 A, *supra*, which immediately follows the above-mentioned provisions, is repeated for convenient reference:

> For equipment which has to be *specially* fabricated, shop drawings and detailed description shall be submitted. [Emphasis added.]

The plain import of the above-quoted provision is that shop drawings of electrical equipment need not be submitted if the item did not have to be specially fabricated.

It is clear that both the ASCO switch and the Russelectric switch were the standard product of a manufacturer regularly engaged in the production of automatic switches. Neither switch had to be "specially fabricated" in the sense this phrase is used in Paragraph 801–5 A, *supra*. The fact that R. G. Russell,

Inc., as the manufacturer, refused to take the switch back for credit does not mean that the switch was specially fabricated. Although an automatic transfer switch is not an "off the shelf" item which may be readily resold, it is clear that at least a copy of both the Russelectric and the ASCO switches must have been developed, pretested and generally advertised for sale prior to the award of this contract. Neither switch was "specially fabricated" for this contract.

■ ■ It is significant to note that all items in plaintiff's consolidated list of materials and equipment to be used, including the Russelectric switch, were approved with the exception of "Switchboards & Panelboards" for which submittal of shop drawings was required by the Resident Engineer. Shop drawings were not submitted nor requested for either the Russelectric or the ASCO switch. The parties must have interpreted the paragraph to apply to special designs for switchboards and panelboards, but not to apply to automatic transfer switches of standard manufacture. Such understanding on the part of the parties should be accorded great weight. *See, e. g.*, Chase & Rice, Inc. v. United States, 173 Ct.Cl. 740, 746, 354 F.2d 318, 321 (1965); Blanchard v. United States, 171 Ct.Cl. 559, 566, 347 F.2d 268, 273 (1965). Moreover, it is well settled that "[w]here the Government draws specifications which are fairly susceptible of a certain construction and the contractor actually and reasonably so construes them, justice and equity require that that construction be adopted." Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947). *See also,* Gorn Corp. v. United States, 191 Ct.Cl. 560, 424 F.2d 588 (1970).

There being no contractual obligation to submit shop drawings for examination, it is concluded that the manufacturer's data which was submitted by plaintiff was adequate to notify and inform defendant that the Russelectric switch, though differing in certain details from the ASCO switch as noted by the Government, was proposed as an

equal substitute in accordance with contract requirements.

 Even absent the persuasive evidence outlined hereinbefore that plaintiff submitted adequate information to notify the Resident Engineer of the proposed substitution, in light of the Government's unexplained failure to call the Resident Engineer as a witness at the Board hearing, or to arrange to have his testimony made a part of the administrative record by deposition, it is reasonable to conclude that had he been called he would not have given testimony more favorable to the Government. Rice Barton Corp. v. United States, 88 F.Supp. 271, 275, 115 Ct.Cl. 575, 593 (1950). It can therefore be assumed that the Resident Engineer was familiar with the contract requirements for the automatic transfer switch, that he studied and understood the information set forth in the brochure regarding the motor operated mechanism and the inductive load arc quenching property, and that, as a result, he recognized the difference before approving the Russelectric switch. Moreover, from the above assumptions, it logically appeared that the Resident Engineer agreed with plaintiff that the standard of quality clause was applicable, and that the Russelectric switch was consistent with its limitations.

 Nevertheless, it is appropriate to fully examine the record to determine whether the facts show, as a matter of law, that the Russelectric switch was a suitable substitute for the ASCO switch described in the specifications. Accordingly, it is necessary to consider the three objections made by the Central Office Engineering Service of the Veterans Administration supporting its withdrawal of approval for the installation of the Russelectric switch. Those objections were: (1) that the Russelectric switch was not inherently double-throw; (2) that it was motor driven rather than solenoid actuated; and (3) that it did not have arcing contacts.

As noted by the Board in its opinion, at p. 31,636, the first objection is without merit. The Government was forced to admit that if the ASCO switch was "deemed inherently double-throw so must the Russell [sic] switch which was proffered."

With regard to the second objection, the evidence in the record discloses that after an investigation of the comparative merits of the motor driven and solenoid actuated automatic transfer switches, the Government concluded that its "confidence in the solenoid actuator is not as strong now as it was before and * * * that a properly designed, good quality motor will give the same degree of reliability as the solenoid." The Government did not dispute that the Russelectric switch had a properly designed, good quality motor.

Finally, as to the third objection, the evidence indicates that different arc protection devices were warranted for the ASCO and Russelectric switches due to the variation in the metallurgical composition of their respective contacts. No objection was made as to the performance of the Russelectric arc protection device when combined with the other properties of the Russelectric switch. It is therefore concluded that the above objections made by the Central Office Engineering Service did not justify rejection of the Russelectric switch, given the applicability of the standard of quality clause. Rather, the weakness of these objections, coupled with the evidence provided by plaintiff, indicates that the Russelectric switch would have proved as effective and as durable in the performance of the contract work as the ASCO switch described in the specifications.

In light of the foregoing, it is concluded and held that plaintiff is entitled to an equitable adjustment, which the Board should have granted under the "Changes" clause of the contract, by reason of plaintiff being required to install the ASCO equipment rather than Russelectric equipment.

The one question remaining is the amount of the equitable adjustment due plaintiff. As to this matter, defendant

makes the following pertinent statement in its brief to the trial commissioner:

> If, for any reason, the Court holds that there are to be any further proceedings on plaintiff's claim, they should be before the VACAB and proceedings in this Court should be dismissed in order to permit those proceedings to go forward. This is true both with respect to any matters relating to the merits and as to the amount due, if plaintiff is entitled to recover.

It is not clear from the above-quoted language or anything else said by defendant, whether it actually disputes the amount of $11,500.63 claimed by plaintiff to be due. It is clear from plaintiff's reply brief submitted to the trial commissioner, however, that plaintiff construes defendant's statement to mean that if the court should hold, as it has done, that plaintiff is entitled to recover, the matter should be referred back to the VACAB for determination of the amount due plaintiff as an equitable adjustment. In view of the foregoing, and the fact that this is a recurring problem, it is deemed advisable to discuss this question in some depth.

As previously mentioned, the usual procedure in a case such as this—where the administrative board never reached the question of damages because it determined the issue of liability in favor of the Government and that decision is ultimately reversed by this court, as here—is to stay proceedings in order that the parties may return to the Board and afford it an opportunity to make findings as to the amount of the claim in the first instance. This is compelled by the decision of the Supreme Court in United States v. Anthony Grace & Sons, *supra,* and is facilitated by Rule 167 of this court. However, the instant case presents an entirely different set of facts and circumstances than those present in the *Grace* case.

At the time of the Board hearing below, the hearing examiner inquired as to whether the parties desired to prove costs during the hearing or whether, in the event it was held that an equitable adjustment should be made, the matter should be remanded to the contracting officer for determination of the amount of the equitable adjustment. In response to this question, the attorney for plaintiff stated to the effect that plaintiff had already filed and would formally offer into evidence during the course of the hearing, certain depositions and exhibit material attached thereto, which in plaintiff's opinion constituted sufficient proof to substantiate the amount of his claim; and that, therefore, if the Board decided plaintiff was entitled to recover, he desired the Board to also make a determination as to the amount due him. Plaintiff's attorney also stated to the hearing examiner that if the VA wished to introduce any rebuttal testimony relative to the amount of plaintiff's claim, such testimony should be presented at that time.

The attorney for the VA stated that he had no objection to plaintiff's request, and indicated that in his opinion plaintiff's exhibits adequately substantiated the amount of his claim, and that the amount thereof was legitimate. The VA did not offer any rebuttal testimony or other evidence during the Board proceedings regarding plaintiff's cost figures or amount of his claim. If the VA had any rebuttal evidence relevant to the amount of the equitable adjustment claimed by plaintiff, which it wished to introduce, such material should have been presented to the Board.

Without contradiction by the Government, all evidence relating to the amount of the claim contained in the record was presented by plaintiff, including a computation of the various elements constituting plaintiff's claim, and testimony presented on both direct and cross-examination by plaintiff's Contract Manager, explaining the nature of the costs incurred by reason of the VA's action in withdrawing its approval of the Russ-electric switch and requiring plaintiff to furnish ASCO equipment. Defendant should not now be heard to dispute

the legitimacy of the amount claimed. From a review of the record as a whole, it is held that there is sufficient evidence, which was accepted without question by defendant, to support a finding as to the proper amount of the equitable adjustment due plaintiff.

If the Board had decided the issue of liability against the Government, it undoubtedly would have proceeded to the question of quantum, and it would have had no difficulty in arriving at the exact dollar amount of the equitable adjustment due plaintiff. Moreover, the evidence in the record relative to costs and expenses incurred by plaintiff is such that for the Board to have made a finding supported by substantial evidence, it could have made only one finding. Under such circumstances, it would seem to be entirely illogical to send the case back to the Board.

Thus, this case presents the question of the exact scope of the holding by the Supreme Court in *Grace, supra,* when the Court stated at 384 U.S. 430, 86 S. Ct. 1543:

> * * * When the Board fails to reach and decide an issue because it disposes of the appeal on another ground * * * which the Court of Claims later rejects, there is no sound reason to presume that the Board will not promptly and fairly deal with the merits of the undecided issue if it is given the chance to do so.[6] [Fn. 6 quoted *infra.*]

In resolving the above-stated question, it is necessary that the quoted pronouncement of the Supreme Court be considered in context with footnote 6 appended to that holding, which reads:

> 6. We see no reason, in this regard, to distinguish between theories of liability not considered below and the issue of damages, which may not initially have been considered if the Board found no liability. If, because of the disposition of the case on appeal, any of these issues becomes important, the Board should be given an opportunity to consider them first. The rule we

announce necessarily disapproves of such cases as Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 162 Ct.Cl. 802 and WPC Enterprises, Inc. v. United States, 323 F.2d 874, 163 Ct.Cl. 1, in which the Court of Claims retained the issue of damages after it reversed the Board's finding of no liability.

The above quotations, particularly the footnote dealing with damages, seem, at first blush, to encompass all cases where an issue is not decided by the administrative board. However, this interpretation, at least in regard to the question of damages, must be tempered by the Court's citation of Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 162 Ct.Cl. 802 (1963), and WPC Enterprises, Inc. v. United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963). Those cases both involved the factual pattern in which this court reversed the decisions of administrative boards on liability, and then remanded the cases to the court's trial commissioner for the purpose of making a determination with respect to the issue of damages. The opinion of this court in *Stein Bros.,* however, states 337 F.2d 864, 162 Ct.Cl. at 808, "very little testimony was taken on that issue before the Board," and in *WPC Enterprises,* the issue of damages was not even tried. This is hardly the situation here. As noted previously, not only has the issue of quantum been tried by the VACAB, but based on the record there is but one proper determination which the Board could have possibly made. It would be an exercise in mere semantics and illogical to conclude that this case is covered by the language contained in the Court's opinion in the *Grace* case quoted hereinbefore.

Furthermore, as demonstrated by the decisions in *Maxwell Dynamometer Co., supra,* and *Ray D. Bolander Co., supra,* as well as in Southwest Welding & Mfg. Co. v. United States, 373 F.2d 982, 179 Ct.Cl. 39 (1967), this court has not felt compelled to send all cases back to the administrative board for further proceedings where the evidence as to a relevant finding of fact is undisputed, or

where the evidence is such that for the board to make a finding supported by substantial evidence, the board could only have made one finding. It appears logical to conclude that this same principle is as applicable to those findings which must be made in reaching a decision on the amount of an equitable adjustment as it is to those that are essential in determining the question of liability.

Finally, although some question may be raised as to the propriety of this procedure when examined in the light of the decision in the *Grace* case, no such question can be seriously raised when it is measured against clearly applicable statements made by the Supreme Court in United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), where Mr. Justice Harlan stated that:

> * * * there would undoubtedly be situations in which the court would be warranted, on the basis of the administrative record, in granting judgment for the contractor without the need for further administrative action. * * * [*Id.* 717, 83 S.Ct. 1415.]

Under the circumstances present in this case, it appears to be one of the "situations in which the court would be warranted, on the basis of the administrative record, in granting judgment for the contractor without the need for further administrative action." The facts relating to the amount of plaintiff's claim are before the court and no dispute between the parties as to such facts is disclosed by the record. It is therefore my opinion that the instant case should be deemed to fall within the line of cases decided by this court, i. e., line of cases decided by this court, *i. e.*, *Maxwell Dynamometer Co., supra, Ray*

*D. Bolander Co., supra,* and *Southwest Welding & Mfg. Co., supra,* which hold that in certain situations it may make findings of fact that are necessary in order to enter judgment, and need not stay proceedings to allow the parties to return to the Board for the purpose of obtaining an administrative determination with respect to such factual matters.[4]

For the foregoing reasons, it is held that plaintiff is entitled to an equitable adjustment of $11,500.63, and judgment should be entered for plaintiff in said amount.

### CONCLUSION

Upon the basis of the foregoing opinion, which is adopted by the court and made a part of the judgment herein, plaintiff's motion for summary judgment is granted, defendant's cross-motion for summary judgment is denied, and judgment is entered for plaintiff in the sum of $11,500.63.

---

4. Unlike the situation in Southwest Welding and Mfg. Co. v. United States, 413 F.2d 1167, 1187, n. 23, 188 Ct.Cl. 925, 957, n. 23 (1969), in the present case, as the court understands the administrative record, the plaintiff asked that the administrative proceeding determine quantum as well as liability, neither the Government nor the Board objected to such procedure, and the Government's counsel accepted and acquiesced in the plaintiff's proof of damages at the administrative hearing, deliberately choosing not to contest that proof. [footnote by the court]