TOWNE REALTY, INC. and Woerfel Corporation, A Joint Venture

v.

The UNITED STATES.

No. 512–80C.

United States Claims Court.

Oct. 29, 1982.

As Modified Nov. 3, 1982.

Herman M. Braude, Washington, D.C., for plaintiff; Braude, Margulies, Sacks & Rephan, Washington, D.C. of counsel.

Marsha D. Peterson, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

WIESE, Judge:

This case is before the court on cross-motions for summary judgment. At issue is a decision of the Armed Services Board of Contract Appeals (the board) denying the contractor's claim (plaintiff here) to an equitable adjustment in contract price for alleged constructive changes in the Government's application of the contract's finish standards.[1] On the basis of the administrative record, the parties' briefs, and the oral arguments presented in connection there-

with, the court concludes that the administrative decision is erroneous as a matter of law. The decision is reversed; judgment on liability is entered in the contractor's favor.

## FACTS[2]

The subject contract involved the design, construction and delivery to the Government "ready for use" of 70 separate buildings containing 250 housing units for military families stationed at Peterson Field—an Air Force Base located in Colorado Springs, Colorado. During the final stages of the construction work, a dispute arose between the parties concerning the standards against which the interior finish appearance should be measured. That is to say, the contract norm for acceptance was "industry and local standards"; the controversy centered on the content of those standards.

Efforts to resolve this problem eventually took the form of a contract modification (Modification 27). In the draft version of this modification (prepared by the Government and transmitted to the contractor for review) there appeared two paragraphs bearing immediately on the issue. The first of these, paragraph 4, said, in essence, that dwelling units would be accepted for beneficial occupancy if "found to meet all contract requirements as modified herein * * * or where only a few interior corrections of a minor nature are required and later correction while occupied or other consideration is mutually agreed upon between the contractor and the Contracting Officer." The second paragraph of importance, paragraph 9, set forth a list of specific defects that the Government would accept without correction, to wit: "scratches in aluminum door frames, window frames and glass * * * aluminum window frames without the caulking being totally cleaned from the joints * * * the plastic covered wood base in lieu of the specified 4-inch rubber base * * * deviations from the specified ceramic tile layout * * * minor repair of chipped bath-

1. The decision on appeal is reported below as *Towne Realty, Inc., and Woerfel Corporation, A Joint Venture.* ASBCA No. 20757, 80–1 BCA ¶ 14,307.

2. The facts given here and in the discussion that follows have been taken from the administrative decision.

tubs * * * and chipped lavoratories subject to the one year warranty provision."

The contractor did not find the proposed modification acceptable. Objection was directed, not to the text of the language *per se;* rather, it went to the fact that, in ongoing inspections by the Government, the contractor was being confronted with "punchlists" that called for the correction of the same sort of minor cosmetic deficiencies which the contractor had thought the proposed modification was meant to overcome.

The upshot of the contractor's opposition and insistence upon clarification was the parties' adoption of a prototype unit to serve—as the board had put it—as "a standard of finish appearance." (80–1 BCA at 70,517.) The unit that was chosen, unit 3F, was one which had been previously inspected by the Government. Upon reinspection of this unit by the parties (this in contemplation of its adoption as a prototype) there remained for correction by the contractor some 17 (or roughly half) of the cosmetic defects which the Government had earlier punchlisted. As to these unaccomplished corrections, the board found that the parties had agreed (at the time of their reinspection) that the contractor need correct only three—improvement of wall texture, stool relocation and filler spigot replacement. The remaining items were accepted as they were.

With the adoption of the prototype unit, the language of the proposed modification was expanded to include a paragraph 15. This read, in full, as follows:

Unit 3F shall be selected as a prototype to represent what is considered to be acceptable standards of workmanship and materials in addition to other prototype acceptances contained herein.

The proposed agreement, as thus modified, was executed by the parties.

In its application, the modification accomplished nothing. No sooner had that document been signed than the parties were once again at loggerheads on the question of the appropriate finish standards. There was more discussion but nothing came of this. In the end, the contractor yielded to the practicalities of the situation: it announced its intention to honor the Government's punchlist demands while, at the same time, reserving its right to seek relief, in the future, on disputed items. It was in this posture that the issue eventually came before the board for resolution.

## DISCUSSION

The basic question that the board was called upon to decide was the meaning of Modification 27, in particular, the significance, in that agreement, of the parties' adoption of unit 3F as a prototype unit. As to this issue, two points were argued by the contractor: first, that the prototype was intended to reflect a standard of finish appearance rather than portray a catalog of unacceptable defects; second, that as a standard of finish appearance, the prototype signified the Government's agreement to exclude from future punchlists all cosmetic deficiencies of a minor nature. The board accepted only the first of these contentions; the second it rejected. It is this rejection, and the reasoning in support of it, which define the issues on appeal.

As the board reasoned it, the expansive purpose that the contractor ascribed to the parties' adoption of the prototype unit (acceptability of all cosmetic deficiencies of a minor nature) was not a supportable position given (i) the far more restrictive language that appeared elsewhere in the same agreement (*i.e.,* paragraph 4 of the contract modification which spoke in terms of beneficial occupancy not being delayed "where only a few interior corrections of a minor nature are required"), and, (ii) the enumeration of specific "acceptable" defects that also appeared in the same agreement (*i.e.,* paragraph 9). Thus the board wrote: "If the appellant's version of Contract Modification No. 27 is to be accepted, paragraph 4 must be read out of the document and paragraph 9 given a general meaning unwarranted by the restrictive language employed." (80–1 BCA at 70,517.) "This", the board went on to say, "is not interpretation but rather is modification." (*Id.* at 70,517.)

Based upon that view of the matter, the board concluded that the parol evidence rule stood in the way of giving any heed to the contractor's contention. In short, the board apparently decided that the enlargement of the parties' draft agreement by the addition of paragraph 15 (the clause incorporating the prototype), added nothing of substance to the intentions embodied in the draft agreement—the adoption of the prototype simply gave an objective dimension to the purposes otherwise contemplated by paragraphs 4 and 9. And, having rejected the contractor's argument, the board then went on to decide that the Government had properly administered the intentions of the agreement and that the contractor had failed to show otherwise.

■ On the face of it, perhaps, the board's decision passes muster. But trouble sets in with the facts. We start with the point that the contractor's insistence upon the adoption of a prototype was borne of its disagreement with the inspection standards to which the Government was adhering even while the draft of the proposed modification was before the contractor for review. Given that as the starting point, one would have to question a contract interpretation which seems to conclude—as this board opinion does—that the later adoption of a prototype unit did not enlarge the parties' agreement beyond restating, through the addition of a specific example, the selfsame inspection criteria with which the contractor had expressed disagreement from the start.

Granted, the contractor would be struck with such a result if that, in fact, was all that the prototype deliberations had accomplished. But the facts show otherwise. As previously noted, at the time unit 3F was visited by the parties (this immediately pri-

or to their decision to use that unit as the prototype) there remained for correction some 17 cosmetic deficiencies which the Government had punchlisted just a few days earlier. With respect to these yet-to-be-corrected deficiencies, there was sharp conflict in the testimony as to whether or not the parties, during their survey of the unit as the prospective prototype, had then agreed that the contractor would have to correct all of the remaining listed deficiencies or only three particular items. The board resolved this point in the contractor's favor. Relying on the text of a contemporaneous memorandum of the site visit that had been prepared by the contracting officer, the board found "that the appellant only agreed to correct the three work appearance defects enumerated in the contracting officer's memorandum [*i.e.,* relocation of bathroom stool, replacement of bathroom spigot and correction of family room wall texture]." (80–1 BCA at 70,514–70,-515.)

This finding is solidly grounded on the evidence presented to the board.[3] And, under any view of this case, the finding is critical. What it means, at a minimum, is that the Government had agreed to accept, as a standard of reference for all future work, cosmetic deficiencies of a quality that had been earlier judged unacceptable—*even under the terms of the then-pending draft modification.* This conclusion, though never articulated by the board, is nonetheless unavoidable given the fact that unit 3F, with certain of its cosmetic deficiencies left uncorrected (and deliberately so), was thereafter adopted by the parties as the contract prototype.

This then brings up the first problem with the board's decision. The board, as we

---

3. The contemporaneous memorandum upon which the board's finding was based is quoted in full in the opinion. (80–1 BCA at 70,514.) Among other things, this memorandum states that "[a]fter each [punchlist] item was reviewed, and discussed, Lt Col Greenwood mentioned why we [the Government] felt that these items (stool too close to vanity, filler spigot on the tube in the master bathroom and the bad texture on wall in the family room) were objec-

tionable and not acceptable to the Government." The memorandum goes on to state that "Capt Sawyer [the contracting officer] stated that if this unit is a prototype then this must represent the minimum the Government will accept and these three items we feel we cannot live with." Finally, the memorandum indicates that "Mr. Waltz [the contractor's representative] relented and agreed to correct these three items."

have noted, rejected the idea that, by their adoption of the prototype, the parties contemplated the acceptability of *all* cosmetic deficiencies of a minor nature. Of this argument, and the board's analysis concerning it, more shall be said later. The immediate difficulty is that the decision leaves unclear what significance, if any, the board did attach to the prototype in its interpretation of the parties' agreement. True, there is language in the decision that seems to concede affirmative recognition to the standards embodied in the prototype. What fosters uncertainty, however, is that the same line of reasoning which had led the board to reject the contractor's contention would also have led it to reject any definition of prototype standards that carried beyond the bounds of paragraph 4 and 9. Thus, when the board refers to the finish appearance standard of the prototype it is just not clear whether, in its view, that standard comprehended only what paragraphs 4 and 9 would have deemed acceptable or also included the class of additionally acceptable defects that attended the endorsement of unit 3F as the contract prototype.

What further confounds this problem—and here we come to the real sticking point in the decision—is the board's evaluation of the evidence. To explain: In its consideration of the evidence the board began by stating—and correctly so—that the Government bore the burden of proving that the rejection, and required correction, of the contractor's finish work was bottomed upon the proper finish appearance standard as exemplified by the contract prototype. In this connection, the board found that the Government's punchlists were reviewed and edited by a well-qualified inspector who "had a personal and professional familiarity with the context of Contract Modification No. 27 and the finish appearance standard exemplified by the prototype * * *." (80–1 BCA 70,518.) Under this monitoring system, defects were excluded only if they were considered minor from a Government standpoint. So far so good. Where the rub

comes in is that the board also found, of this same individual, that "[h]e * * * understood that the appellant had agreed to correct *all* minor cosmetic appearance items identified on the punch list for housing unit 3F." (Emphasis added; 80–1 BCA at 70,-516.)

There is obviously a flat contradiction here. It simply cannot be the case that the Government punchlists remained faithful to the cosmetic standards of the prototype, as the board had decided, when the individual charged with conforming those lists to the prototype standards failed to understand their total content. In light of the board's own finding respecting the agreed-upon acceptability of all save three of the uncorrected prototype deficiencies, inspections that were guided by the understanding that *all* prototype deficiencies were meant to be corrected were, *per se,* contractually out-of-bounds.

 There is no recognition in the board's opinion concerning this critical contradiction between the prototype standard and the inspection procedure that was followed under it. The absence of any discussion on the point is perhaps only explainable on the ground that the board saw no contradiction in the first place, meaning, that the board never perceived the prototype standards as being part of the parties' bargain. But, whatever the reason, this much is certain: it was error for the board to have rejected the sufficiency of the contractor's proof in the face of a finding whose plain implication was that the inspection standards were squarely at odds with those of the prototype. On the record as it then stood, the contractor had at least made out a *prima facie* case and the onus of the proof from that point on should have been upon the Government; not the contractor. Moreover, unless the Government's evidence had been sufficient to overcome the adverse implications of the chief inspector's erroneous perception of the prototype standards—and such was not the case [4]—judg-

---

4. Evaluation of the evidence is, generally speaking, a task exclusively assigned to the

board and not the court. However, in those limited situations where the evidence in the

ment on liability should have been entered in the contractor's favor.

 There remains to be discussed the final point in the case: the proper construction of the parties' agreement insofar as it relates to the prototype unit. We start by restating the point earlier made, namely, that by their agreement on the prototype, the parties did enlarge the standards of acceptable finish work beyond those which had been observed by the Government under the draft modification. This much is almost self-evident given the circumstances which had attended the contractor's call for a prototype and the subsequent endorsement of the prototype notwithstanding its unaccomplished cosmetic deficiencies. To the extent the board may have thought these attendant circumstances beyond reach in deciding upon the meaning of the parties' agreement, its decision was wrong as a matter of law. Neither the specific language of the agreement nor the parol evidence rule stood in the way of giving full recognition to the intentions manifested by the parties' conduct and words in their adoption of the prototype. We leave the reasons for this conclusion to a footnote.[5]

The real question here is not whether agreement upon the prototype did substantively enlarge the scope of the draft modification; rather, the question is whether that enlargement went as far as the contractor claims: to render all minor cosmetic deficiencies acceptable.

The proposition that was argued before and thereafter found by the board was that the prototype represented agreement, not upon a list of specific defects, but upon a standard of finish appearance. And translated into practical terms, what that standard meant to the contractor was that all minor cosmetic defects were to be considered acceptable.

As the court sees it, the difficulty with this position is that it seeks to qualify, by absolute terms, what was never more than a purely subjective standard to start with. That is to say, it might well be true that, in a given dwelling unit, the acceptance of all minor defects would not transgress the fin-

---

record points to only one conclusion, then any further factual determinations necessary to the disposition of the case may be made in this forum. *Sherwin v. United States*, 193 Ct.Cl. 962, 979, 987–91, 436 F.2d 992, 1002, 1006–08 (1971). That is the situation here. Under any view of the evidence in this case, it could not be concluded that the Government honored the standards of the prototype even while its inspectors failed to understand the scope of those standards. Indeed, both in its brief and at oral argument, plaintiff maintained that the Government's punchlists excluded *only* the specific defects enumerated in paragraph 9; all else required correction. The accuracy of this contention has gone unchallenged.

5. The board's rejection of the contractor's argument appears to have been premised on the view that contract modification 27 represented the final and exclusive embodiment of the parties' agreement and, as such, the meaning of the agreement could only be derived from the words that it recited. There are two fundamental problems with this approach. First, assuming, as the board did, that modification 27 was a fully integrated document, it would still have been error to have concluded that the parol evidence rule forbade resort to extrinsic evidence in the search for the document's meaning. The law is certain that "[a]greements and negotiations prior to or contemporaneous with the adoption of a writing are admis-

sible in evidence to establish the meaning of the writing whether or not integrated." *Restatement (Second) of Contracts* § 214(c) and § 212, comment *b*.

Second, even with the analysis confined only to the language of the modification, the conclusion was wrong. Contrary to the board's reading of it, paragraph 4 had nothing to do with "acceptable" defects. So far as interior finish standards were concerned, that paragraph addressed only minor defects amenable to "later correction while occupied." Paragraph 15, on the other hand, dealt with acceptable defects not requiring later correction. There was no antagonism between these two provisions. As to paragraph 9, the board's notion that this provision was intended as the exclusive list of acceptable defects was also not correct. The agreement on its face dispells this idea: the prototype clause (paragraph 15) identified unit 3F as the prototype for acceptable standards of workmanship and materials "*in addition to other prototype acceptances contained herein.*" (Emphasis added.) In light of the parties' deliberations respecting the prototype and the board's own finding as to what acceptance of the prototype had entailed so far as cosmetic deficiencies were concerned, there can be no question that paragraph 15 intended more than the board thought.

ish appearance standard represented by unit 3F whereas, in another instance, minor cosmetic deficiencies might well do violence to that standard. Indeed, the prototype itself is illustrative: half of that unit's cosmetic deficiencies had been corrected before it became the contract model. Bearing in mind that that unit represented the minimum the Government would accept, it reaches too far to contend that all minor cosmetic deficiencies were subsumed by the contract prototype. The point then is that matters subjective, such as comparative finish standards, do not lend themselves to the seemingly absolute rule for which the contractor argues.

Insofar as the prototype was concerned, the parties gave their agreement no specificity beyond joining together on the content and purpose of the prototype. Perhaps, as some of the witnesses had suggested, greater specificity was really not possible (or desirable) given that the prototype was meant to serve as a norm of finish appearance rather than as a catalog of particular defects. While contracts are not rendered unenforceable merely because the sufficiency of performance is to be tested against a subjective standard, 5 *Williston, Contracts* § 675A (3d ed. 1961), nevertheless that element of subjectivity does preclude the court from now giving any sharp definition to the parties' agreement. All that can fairly be said is that paragraph 15 marked the parties' agreement upon an in-the-field standard pursuant to which minor cosmetic deficiencies, in addition to those enumerated in paragraph 9, were to be regarded as acceptable so long as their cumulative visual effect, judged either qualitatively and/or quantitatively, was no more severe than the finish appearance shown in the prototype. And this, as had been said, might permit the acceptance of all minor cosmetic defects in one situation even as it might demand the rejection of minor defects in another.

In the subsequent proceedings on quantum, the parties will face the difficult task of reconstructing past events based upon examination of the inspection records com-

piled after unit 3F was established as the contract prototype. If that task proves too elusive then it shall be up to the board to fashion a damage remedy appropriate to the proof as it appears.

CONCLUSION

For the reasons given herein, plaintiff's motion for summary judgment is granted; defendant's cross-motion is denied. Accordingly, the decision of the board is reversed and judgment on liability is entered in the contractor's favor. The case is remanded to the board for further proceedings relevant to the determination of quantum.

"In accordance with United States Claims Court Rule 60.1(a)(b), proceedings in this court shall be stayed for a period of six months or such further additional time as the needs of the case may require. Plaintiff's attorney shall provide the court with the required status reports."