ELECTRO–METHODS, INC.

v.

The UNITED STATES.

No. 582–83C.

United States Claims Court.

Oct. 3, 1983.

Kenneth S. Kramer, Washington, D.C., for plaintiff. John T. Boese, William Lieth, and Fried, Frank, Harris, Shriver & Kampelman, Washington, D.C., and James F. Byrne, and Byrne, Schechtman & Slater, P.C., Hartford, Conn., of counsel.

Alexander Younger, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant. Brian D. Shannon, Dept. of the Air Force, and Major Samuel Roser, Advocate General, Dept. of the Air Force, Washington, D.C., of counsel.

## OPINION

HARKINS, Judge:

Plaintiff's complaint, filed September 19, 1983, sought injunctive and declaratory relief to prevent award of contracts for jet engine spare parts on the ground that it had been unlawfully suspended under Defense Acquisition Regulation (DAR) § 1–606 procedures. At the hearing on September 20, 1983, on the motion for a temporary restraining order, defendant agreed to defer action on outstanding solicitations until September 29, 1983, and a briefing schedule was established. No ruling was required on plaintiff's motion for a temporary restraining order. Plaintiff on September 23, 1983, renewed its motion for a preliminary injunction, and moved for summary judgment. On September 27, 1983, defendant filed a motion to dismiss or in the alternative a motion for summary judgment. These motions were heard on September 29, 1983.

At the conclusion of argument, the parties were told that, in view of the need for prompt action to avoid procurement prob-

**502**

lems presented by the end of a fiscal year, an order would be entered on September 29, 1983, to dispose of the pending motions and state the ultimate findings on the legal and factual matters involved. The order to be followed by a detailed opinion. The order was filed at 4:30 p.m. September 29, 1983.

## FACTS

Electro-Methods, Inc. (EMI) manufactures and sells parts for jet aircraft engines. It started business in 1965, and initially was solely a supplier of jet engine parts for Pratt and Whitney Aircraft, Inc. (P & W), now a subsidiary of United Technologies, Inc. (UTI). In the early 1970's, EMI started to obtain prime contracts from the United States military services for military jet engine spare parts, and by 1982, such prime contracts accounted for 78 percent ($21 million) of EMI's total sales volume ($27 million). In 1982, EMI's volume of business with P & W amounted to $3,050,000, of which about $1,200,000 was for military jet engine spare parts.

EMI produces spare parts for the F–100 jet aircraft engine program. The F–100 engine powers the F–15 and F–16 fighter aircraft used by the Air Force, NATO countries and other allies of the United States. P & W is the original manufacturer of the F–100 engine; it is in competition with EMI for contracts for the sale to the Air Force of F–100 engine spare parts.

The president and owner of EMI is Alfred T. Stanger.

On June 8, 1983, the United States District Court for the District of Connecticut issued a search warrant based on an affidavit signed by FBI special agent Brian W. O'Keefe (O'Keefe affidavit). The warrant authorized search of EMI's premises and the seizure of a variety of property, including P & W blueprints, P & W pricing data, and documentation related to plaintiff's own pricing data. The warrant recited that this property was to be seized as evidence of the crimes of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), conspiracy to defraud the United States (18 U.S.C. § 371), and false statements to a department or agency of the United States (18 U.S.C. § 1001).

On June 9, 1983, the United States District Court for the Southern District of Florida issued a search warrant based on an affidavit by FBI special agent James Cavanaugh, III. The warrant authorized the FBI to search the home of Richard I. Horowitz, a P & W employee, to seize a small personal computer and ancillary equipment, as well as financial and corporate records of a corporation, Sandrich, Inc. The property was to be seized as instrumentalities used in violation of 18 U.S.C. §§ 1343, 371 and 1001.

The O'Keefe affidavit contained 32 pages that describes an FBI investigation which began in late 1982 when the FBI received the results of an investigation which had been conducted by United Technologies Internal Security (UTIS), the investigative arm of UTI. The UTIS investigation involved dealings between Leonard Burke, a P & W employee in the purchasing department and John Kimatis, an employee of EMI, relative to transmittal of P & W drawings, specifications, and pricing information for P & W engine parts. The FBI obtained a court order to place a pen register on Burke's telephone at P & W and obtained grand jury subpoenas for telephone toll records of numerous individuals related to the investigation. The United States Attorney's office also obtained court orders that give specific UTIS employees access to materials obtained pursuant to grand jury subpoena. The FBI concluded that there was probable cause to believe EMI had obtained blueprints and pricing data from P & W, and then bid against P & W in response to Air Force solicitations. The O'Keefe affidavit set forth several specific examples.

The Cavanaugh affidavit states that since December 19, 1982, one of Cavanaugh's assignments had been to investigate the involvement of Richard I. Horowitz in connection with the theft of "pricing" information from P & W, and the sale of that information to P & W competitors. The affidavit states that Horowitz was inter-

viewed in Hartford, Connecticut, on June 8, 1983, by FBI special agent O'Keefe and James M. O'Neil of UTIS. During this interview, according to the affidavit, Horowitz stated that, for the past 3 years, he had taken pricing information obtained in his employment as Pricing Supervisor at P & W in West Palm Beach, Florida, and had transmitted this information to Alfred T. Stanger in Windsor, Connecticut. In the interview, Horowitz also is said to have stated during this time he received payment from Stanger's company in excess of $40,000 per year, in the form of checks made payable to a company called Sandrich, Inc., created by Horowitz in Florida. In the interview, Horowitz also is said to have stated that for the past year he had transmitted pricing information from West Palm Beach to Connecticut by means of a small personal computer which he had received from Stanger. On June 9, 1983, Cavanaugh met Horowitz at the P & W airfield when Horowitz returned from Connecticut. Horowitz at first agreed to turn over the computer, but on arrival at the home, Horowitz withdrew consent for the FBI agents to enter the home, or to remove the computer.

The FBI search warrants were executed on June 8, 1983, in Connecticut and June 9, 1983, in Florida. The grand jury investigation is pending.

The Air Force learned of the search warrants by means of a letter dated June 21, 1983, from B.H. Aircraft, Co., Inc., a competitor of plaintiff. B.H. Aircraft previously had complained about, and recommended suspension proceedings against, Turbo-Tech, Inc., another company in which Stanger was a principle, and the June 21, 1983, letter stated that the O'Keefe affidavit substantiated its earlier charges. Thereafter, the Air Force Debarment and Suspension Board (Board) contacted the FBI office in Hartford, Connecticut and obtained copies of the Affidavits.

In June 1983, P & W terminated all of its business relationships with EMI. In June 1983, EMI obtained copies from the respective courts of the O'Keefe and Cavanaugh affidavits.

In early July 1983, EMI through counsel requested a meeting with the general counsel of the Air Force on July 11, 1983. On July 7, 1983, EMI's counsel submitted a 9-page memorandum as background information for the July 11, 1983, meeting, which had been requested by EMI because certain allegations against it have resulted in bids on Air Force contracts "apparently were being put on hold." The memorandum discussed allegations against Burke and Horowitz and stated that the results of an Air Force investigation would show that none of the allegations were true. In connection with the question of bids being put "on hold," the memorandum included an extensive discussion of the suspension regulations.

On July 11, 1983, EMI counsel met with Air Force counsel and Air Force procurement officials. During the meeting EMI was told that no hold had been placed upon contracts on which EMI had bid, and that the field offices had been directed to use their own judgment as to when it was appropriate to make contract awards. EMI was told that the Air Force was conducting its own review of the affidavits, and was considering what action might be appropriate under the debarment and suspension procedures, which were explained in detail. EMI was told that grand jury information was not used in on-going investigations and that the information the Board would use for its decision would be that available to the public and which could be released in the event suspension was recommended. EMI provided some information in the form of computer printouts and summaries that were claimed to show a decrease in awards to P & W and the effect of competition on prices, and asked if EMI could provide additional information to the Board. EMI was told that it could provide whatever information they thought might be appropriate and that it would be considered.

On July 20, 1983, EMI submitted additional information that contained a study based upon contracts awarded EMI by Kelly and Tinker Air Force Bases in 1981, 1982 and 1983 to date.

On July 22, 1983, EMI's counsel made a presentation of plaintiff's position to Air Force counsel and Air Force procurement officials. The presentation included a number of documents designed to refute the O'Keefe affidavit. At that meeting, EMI was told that debarment and suspension were still under review and that any additional information or documents, including affidavits, which were furnished would be given consideration.

On July 25, 1983, EMI submitted newspaper articles dated July 21 and 22, 1983, and a video tape and transcript of a television program aired July 21 and 22, 1983. On July 28, 1983, EMI submitted an affidavit from Alfred T. Stanger. The affidavit denied that he or any entities that he had an interest in determined prices to be bid on contract orders for spare parts. The affidavit provided no information concerning Burke or Horowitz.

The Board, on July 26 and July 28, 1983, considered the suspension of Alfred T. Stanger, EMI and related companies and individuals, which had been recommended by Headquarters Air Force Logistics Center in Ohio. The Board considered the O'Keefe and Cavanaugh affidavits, all materials that EMI had presented to date, and a memorandum prepared by Air Force counsel to the Board. Air Force counsel advised the Board that the term "adequate evidence" in a suspension case required a showing could be likened to the probable cause necessary for a search warrant. On July 28, 1983, the Board Stanger, EMI, Macor Sales, Inc., International Aerotech, Inc., Jet Data, Inc., Turbo Specialists, Inc., Turbo-Tech, Inc., Hemispheric Aerospace Ltd., Sandrich, Inc., Richard Horowitz, John Kimatis and Leonard Burke.

The Board's findings, recommendation, and the entire record were forwarded to the Air Force Debarment and Suspension Official for review and further action.

On August 2, 1983, EMI was notified by letter from the Suspension Official that it was suspended from future contracting with any agency of the United States Government. The suspension did not apply to existing contracts, but during the suspension period, the notice stated "bids or proposals shall not be solicited from, contracts shall not be awarded to, existing contracts shall not be renewed or otherwise extended to, and subcontracts shall not be approved with EMI by any United States executive agency," unless the head of the agency determines there is a compelling reason for such action. The notice recited that it was based on adequate evidence that EMI had committed serious irregularities in business dealings that were a threat to the interest of the Government; copies of the O'Keefe and Cavanaugh affidavits, and the findings and recommendations of the Board were attached. The suspension was stated to be for a temporary period "pending the completion of an investigation." EMI was told that it could submit in person, in writing, or through a representative, within 30 days of the receipt of the notice, information and argument in opposition to the suspension. If the submission raised a genuine factual dispute, fact finding would be conducted, unless the Department of Justice advised that substantial interests of the Government in pending or contemplated legal proceedings would be prejudiced.

On September 6, 1983, EMI, and the other suspended entities, filed a written submission in opposition that included a 27-page memorandum, and an appendix with 24 exhibits that contained a total of 146 pages. The September 6, 1983, transmittal letter stated that, if the suspensions were not terminated by the close of business on September 9, 1983, it was demanded that a hearing on the suspensions be commenced no later than September 14, 1983.

On September 8, 1983, counsel for the Board notified the Department of Justice Criminal Division of the suspension and the request for a fact-finding hearing. The Justice Department was told that the suspended contractors requested they be allowed to examine FBI agents O'Keefe and Cavanaugh, any P & W or UTI officials who had informed the FBI that the data in EMI's possession was proprietary, and Air Force and Navy procurement officials as to

standard conduct and practice in procurement of jet engine spare parts. The letter requested advice from the Department of Justice as to any prejudice to pending or contemplated legal proceedings if fact finding were conducted, on the same facts as the suspensions or if the contractors' other requests were granted.

On September 8, 1983, counsel for the Board also notified counsel for EMI that the Board had reviewed the information in opposition to the suspensions and had found that the submission "raises a genuine dispute over facts material to the suspensions" but that the submission did not warrant "an immediate termination of the suspensions." The suspended contractors were told that Department of Justice advice had been sought, and an expeditious response requested.

On September 26, 1983, the Department of Justice advised counsel to the Board that it had "no objection to a hearing before the Air Force Debarment and Suspension Review Board concerning the matters disclosed in the material and information already released by the Board." Any examination of materials beyond that, including an examination of the FBI agents or any data obtained by the FBI during its investigation, the Department advised, "would severely hamper an on-going criminal investigation."

EMI's complaint in this court lists 32 Air Force solicitations for spare parts on which EMI had submitted bids. Five solicitations had been awarded or canceled before the complaint was filed on September 19, 1983, and one was awarded on September 21, 1983. At the September 20, 1983, hearing, defendant's counsel stated he was informed there were then 24 outstanding solicitations and that EMI on some was the low bidder. Further review of official Air Force records showed that, as of September 26, 1983, of the solicitations listed by EMI in its complaint, there were 28 outstanding, either ready for award, being resolicited, or being processed for award. Of the 13 that were ready for award, EMI was the low bidder

on three: F 34601–83–57136, F 34601–83–57115 and F 34601–83–54811.

## DISPOSITION

 This court's jurisdiction to grant equitable relief is found in 28 U.S.C. § 1491(a)(3); jurisdiction is limited to a "contract claim" brought "before the contract is awarded." Unless a complaint is filed in this court before the contract is awarded, this court is without jurisdiction to provide equitable relief. *United States v. Grimberg,* 702 F.2d 1362 (Fed.Cir.1983). Accordingly, this court does not have jurisdiction with respect to the Air Force solicitations listed in plaintiff's complaint on which contracts had been awarded prior to September 19, 1983. EMI's complaint was timely filed, and the jurisdictional requisite for filing before award, was satisfied with respect to all Air Force solicitations on which plaintiff had bid that were outstanding on September 19, 1983.

The record is confused as to the precise identity and number of Air Force solicitations on which plaintiff had bid that in fact were outstanding on September 19, 1983. Both parties have made changes to correct the information in the lists that are included in the record. There is agreement, however, that of the 32 Air Force solicitations listed in the complaint, four had been awarded prior to September 19, 1983, and one had been canceled. There also is agreement that, with respect to solicitations outstanding on September 26, 1983, 13 were ready for award and EMI was the low bidder on three.

One contract was awarded on September 21, 1983, to Union Carbide on solicitation No. F–34601–83–53511, which had been erroneously listed in the complaint as F–34601–83–53535. This contract was awarded after defendant had agreed on September 20, 1983, to defer action on all outstanding solicitations until September 29, 1983. Although the award of a contract on September 21, 1983, is contrary to defendant's agreement, this situation appears to be the result of incomplete information available to defendant's counsel on September 20,

1983. Defendant's counsel had been informed that 24 solicitations remained outstanding, and the commitment was made on that basis.

Defendant's motion to dismiss is premised on the contention that this court lacks jurisdiction because the complaint does not state a "contract claim" within the scope of section 1491(a)(3). The content of the term "contract claim" in that section has proven to be arcane and ephemeral. In litigation that has arisen since equitable power was conferred on October 1, 1982, application of the term has been difficult. *See e.g., Ingersoll-Rand Co. v. United States,* 2 Cl.Ct. 373, 375 (1983) (KOZINSKI, C.J.); *Harris Data Communications, Inc. v. United States,* 2 Cl.Ct. 229, 236 (1983) (NETTESHEIM, J.) and cases therein cited. The statute is not a model of clarity and the scant legislative history is of little assistance to divine the intent of Congress when this court's equitable powers are required to be applied in a specific factual context.

A "contract claim" under section 1491(a)(3) arises from the implied contract, that exists by virtue of the bid solicitation process, that guarantees that responsive bids will be fully and fairly considered. *United States v. Grimberg,* 702 F.2d at 1367. The term is a development from the so-called "bid protest" actions in the United States Court of Claims to recover a money judgment for bid preparation expenses where Government procurement officials failed to afford prospective contractors fair consideration in accordance with the dictates of relevant statute and regulation. *Keco Indus., Inc. v. United States,* 192 Ct.Cl. 773, 428 F.2d 1233 (1970); *Heyer Products Co. v. United States,* 135 Ct.Cl. 63, 140 F.Supp. 409 (1956).

The nature and content of the obligations inherent in this implied contract, as related to compliance with procurement regulations and recognition of constitutional and statutory criteria applicable to the solicitation, have resulted in differing treatment. One line of cases excludes from the obligations that are inherent in the implied contract (and denies equitable jurisdiction under sec-

tion 1491(a)(3)) the following situations: compliance with procurement regulations that impact on all bidders, as distinguished from a direct impact on particular bidders (*Quality Furniture Rentals, Inc. v. United States,* 1 Cl.Ct. 136, 140 (1983) (KOZINSKI, C.J.)); a challenge that the terms of the particular solicitation are defective under the regulations (*Ingersoll-Rand Co. v. United States,* 2 Cl.Ct. at 376; *Hero, Inc. v. United States,* 3 Cl.Ct. 413 (1983) (WHITE, J.)); a contention that debarment procedures under DAR § 1–605 fails to meet constitutional due process standards (*Cecile Indus., Inc. v. United States,* 2 Cl.Ct. 690 (1983) (WIESE, J.)); and compliance with statutory and regulatory criteria of a determination of a bidder's small business status. *Gibralter Indus., Inc. v. United States,* 2 Cl.Ct. 589 (1983) (MEROW, J.).

Other cases, however, have found that the Government's obligations in the implied contract have included compliance with a broader range of constitutional, statutory or regulatory standards. The implied contract has been found to include the following situations: compliance with procurement regulations that impact on all bidders with respect to the effect of failure to sign bid (*De Mat Air, Inc. v. United States,* 2 Cl.Ct. 197, 202 (1983) (GIBSON, J.)); a failure to comply with due process standards and procurement regulations relative to debarment and suspension by referral to the Small Business Administration of the contracting officer's determination of nonresponsibility (*Related Indus., Inc. v. United States,* 2 Cl.Ct. 517 (1983) (MILLER, J.)); unreasonable delay in award of contracts pending referral of responsibility determination to SBA amounted to de facto debarment or suspension and a failure to comply with applicable constitutional and regulatory standards (*ATL, Inc. v. United States,* 3 Cl.Ct. 52 (1983 (MILLER, J.)); and an implied-in-fact contract to a nonbidder of the right to bid in the solicitation at issue, which was related to the preexisting implied-in-fact contract (*American Hoist & Derrick, Inc. v. United States,* 3 Cl.Ct. 198 (1983 (COLAIANNI, J.)); accord, as to

availability of equitable relief on a claim of a preexisting implied contract related to the prospective award of an express one. *Yachts America, Inc. v. United States,* 3 Cl.Ct. 447 (1983 (MAYER, J.)).

It may be that the particular holdings in these cases are appropriate to the facts involved in each, and that the distinctions explained in the opinions are differences without substance. To the extent that they are substantial on the facts of the particular case, however, such matters will have to await illumination and resolution at the United States Court of Appeals for the Federal Circuit.

■ The "contract claim" that is eligible for injunctive relief under section 1491(a)(3) includes, at least, the type of contractual relationships that were considered for monetary awards through the jurisdictional statute of the former Court of Claims, now embodied in section 1491(a)(1). The implied contract delineated in preexisting case law in the bid protest cases included the obligation that the Government's consideration would accord with requirements of the Constitution, statutes, and regulations applicable to contracts with the Government. The seminal Court of Claims cases involved consideration and application of procurement regulations of general application relevant to the particular claims. *Keco Indus., Inc. v. United States,* 192 Ct.Cl. 773, 428 F.2d 1233; *Heyer Products Co. v. United States,* 135 Ct.Cl. 63, 140 F.Supp. 409. The Court of Claims cases accorded with the substantive law declared in *Scanwell Labs., Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970) and *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289 (D.C.Cir.1971). In those cases agency action was reviewed for compliance with the standards of the Administrative Procedure Act (5 U.S.C. § 706(2)(A) (1982)) which authorizes procurement actions to be set aside when not in accordance with law, contrary to constitutional rights, in excess of statutory authority or short of statutory right, or contrary to legal procedures.

Section 1491(a)(3), by its terms, provides a grant of additional power with respect to contract claims; no provision of subsection (a)(3) limits the jurisdiction over contracts that is provided in section 1491(a)(1). The legislative history of the Federal Courts Improvement Act of 1982 reflects the intention that the new equitable powers would be exercised consistent with the *Scanwell* doctrine and existing law. There is no indication that the authority conferred in section 1491(a)(3) was intended to diminish the scope of review of a contract claim, or restrict the nature of the Government's obligations and responsibilities in the implied contracts that are subject to adjudication pursuant to section 1491(a)(1).

The historic jurisdiction of the Court of Claims fell under two categories: (1) claims founded on the Constitution, any act of Congress, or any agency regulation that mandated payment of money, or (2) any express or implied contract with the United States. *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Eastport S.S. Co. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002 (Ct.Cl.1967). An essential element of every compensable contract claim is the requirement that the contract accord with applicable law. To review a contract claim so as to exclude compliance with the dictates of statute and regulation that directly impact on the claim and are essential parts of the claim excludes too much. Such analysis makes an artificial and unreasonable distinction between the two claim categories of section 1491(a)(1).

■ The regulations that are challenged in this case, DAR § 1–606, involve agency action that determines EMI's status to be awarded contracts on bids it was eligible to submit when it responded to the Air Force solicitations. Any procedural infirmity that results in the removal of contractual status under an on-going implied contract, as a matter of common sense and of law, must involve a "contract claim" subject to review in this court. The purpose of the DAR is to provide a vehicle for Government procurements; its provisions have the force and effect of law, and its relevant provisions are implied terms of the implied contract to consider EMI's bid fairly. *Christian & As-*

*soc. v. United States,* 160 Ct.Cl. 1, 312 F.2d 418 (Ct.Cl.1963).

Preaward protests frequently involve assertions that debarment, blacklisting, and suspensions have been improperly and unfairly applied. The bid protest case law has been developed through consideration of such cases. *Scanwell Labs. Inc. v. Shaffer,* 424 F.2d 859; *Horne Bros., Inc. v. Laird,* 463 F.2d 1268 (D.C.Cir.1972); *Transco Security, Inc. v. Freeman,* 639 F.2d 318 (6th Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 101, 70 L.Ed.2d 90 (1981). *See generally,* "Graylisting of Federal Contractors" 31 Catholic University Law Review 731 (1981–82). It would be anomalous to construe the equitable jurisdiction conferred on this court by Congress so as to exclude review for compliance with the procurement regulations that are most intimately involved in preaward contract claims.

■ Accordingly it is held the implied-in-fact contract that arises out of the bid solicitation process, and which guarantees the bidder full and fair consideration, includes a requirement that there be compliance with procurement regulations applicable to that solicitation, and recognition of applicable constitutional and statutory criteria. Accordingly, defendant's motion to dismiss is denied.

The Suspension Official's August 2, 1983, letter stated that the Board's findings and report indicate a lack of business integrity and business honesty that directly affects EMI's present responsibility as a Government contractor or subcontractor. Plaintiff argues that a finding that EMI lacks present responsibility may only be made by the Small Business Administrator, and that the Suspension Official's finding is void ab initio.

Plaintiff relies upon the 1977 amendments to the Small Business Act (15 U.S.C. § 637(b)(7)(A)) that authorizes the SBA to certify all elements of responsibility, including integrity, to receive and perform "a specific Government contract" and prohibits any "Government procurement officer" from precluding a small business concern "from being awarded such contract" without referring the matter to the SBA. Plaintiff also relies upon the requirement of 15 U.S.C. § 637(b)(7)(C) that the SBA certification is "conclusive" on all procurement officers, and "such Government contract" shall be let to the small business concern without further showing of responsibility.

Plaintiff misreads the statute. The legislative history of section 637(b)(7) was examined by the Court of Claims in *Siller Bros., Inc. v. United States,* 228 Ct.Cl. 76, 655 F.2d 1039, 1042–43 (1981) and its conclusions with respect to this issue are binding on this court. The Court of Claims ruled that a procurement officer's authority to bar a defaulting small business contractor is not restricted by the requirement of section 637(b)(7) when the bar is not a consequence of the contractor's small business status.

The Air Force invoked the DAR § 1–606 suspension procedures because the evidence indicated EMI possibly was involved in criminal activities and that a grand jury investigation into violations of the criminal code, including mail fraud, conspiracy to defraud the United States, and false statements to the Government was underway. The Court of Claims in *Siller Bros.,* 655 F.2d at 1044 stated that the purpose of the 1977 amendments to the Small Business Act was to end "the discrimination against small business that existed because contracting officers had barred those businesses solely because of their smallness and disabilities allegedly resulting from that fact." Plaintiff's status as a small business enterprise is not the cause of its suspension.

■ The Suspension Official's August 2, 1983, notice resulted from application of the suspension procedures in DAR § 1–606. Under the regulation, suspension is a "serious action to be imposed on the basis of adequate evidence, pending the completion of an investigation or legal proceedings." On the facts of this case, the Suspension Official's notice was issued ex parte, in that neither the Suspension Board nor the Suspension Official had given EMI an opportunity to rebut the information on which the suspension was based. Defendant points

out that EMI had the opportunity and did present information on the charges in the affidavits at the July 11 and July 22 meetings with Air Force staff, and that this information was considered by the Board and by the Suspension Official. These meetings and submissions, however, were not with the Board or Suspension Official, are not equivalent to a hearing, and do not erase the ex parte nature of the August 2, 1983, notice.

▮ The due process clause of the fifth and fourteenth amendments apply to determinations by Government officials that stigmatize a person as so lacking in integrity that he is to be deprived of property or liberty that otherwise he would enjoy. *Perry v. Sindermann,* 408 U.S. 593, 601–03, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972). Approximately 85 percent of EMI's business is in the manufacture and sale of spare parts bought by the Air Force. Even a temporary suspension from this business inflicts serious damage. In the circumstances, EMI has a right to procedural due process for protection of its property and liberty interests. *Gonzalez v. Freeman,* 334 F.2d 570 (D.C.Cir.1964); *Horne Bros., Inc. v. Laird,* 463 F.2d 1268 (D.C.Cir.1972). Due process includes the right to a hearing, after notice of specific charges, in which the injured person is given a fair opportunity to explain its actions. *Old Dominion Dairy v. Secretary of Defense,* 631 F.2d 953, 968 (D.C.Cir.1980).

DAR § 1–602(a) defines "adequate evidence" as "information sufficient to support the reasonable belief that a particular act or omission has occurred." In assessing adequacy of the evidence, section 1–106(b) informs the Suspension Official that consideration should be given to how much evidence is available, how credible it is, whether important allegations are corroborated, and what inferences can reasonably be drawn. The information available to and considered by the Suspension Board and the Suspension Official meets the regulatory standards for an ex parte temporary sus-

pension. It was adequate to support search warrants in the district courts. *Horne Bros., Inc. v. Laird,* 463 F.2d at 1271. The O'Keefe affidavit includes computerized data and telephone records that corroborated some of the allegations. The Cavanaugh affidavit recites statements and actions by Horowitz that support a reasonable inference that the activities charged in fact may have occurred.

Procedures comparable to DAR § 1–600 have been examined and upheld in *Transco Security, Inc. v. Freeman,* 639 F.2d at 324 and the procedures in DAR § 1–600 were affirmed in *Taylor v. Marsh,* No. 81–2643 (D.D.C. Dec. 3, 1982). *Transco Security* involved a requirement for an adversarial suspension hearing after a constitutionally defective notice; the *Taylor* case involves the question of a hearing after a debarment. Neither of those cases involved the type of ex parte temporary suspension that is crucial in this case.

The content of the due process requirement in a particular instance is determined on the facts specifically involved. The adequacy of the procedures are not to be based on the validity of general regulations, but upon the facts of the case. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Due process, unlike some legal rule, is not a technical conception with a fixed content unrelated to time, place and circumstances. *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Due process is flexible and calls for such procedural protections as the particular situation demands. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

The DAR § 1–606 procedures permit a temporary suspension to be imposed ex parte without a hearing. That course was followed in this case and the suspension was valid and effective when the August 2, 1983, notice was issued. The Board and the Suspension Official complied with the procedures established in the regulation. The procedures, however, do not provide guidance to the Suspension Official as to the

content of his notice when it is given ex parte. The regulation in sections 1–606.-3(c)(2), (5), and (6) does not require that the notice set a fixed time in which the contractor will be heard after the suspension has been instituted. This failure is substantial and it is impermissible.

The temporary suspension is for a period "pending completion of an investigation and such legal proceedings as may ensue," and may extend for as long as 18 months. Meantime plaintiff is denied all access to new Government contracts. At the same time it has not been provided a meaningful opportunity to address the specific charges with its version of the truth. Plaintiff, further, under the regulations as written, on the basis of Department of Justice advice that legal proceedings might be prejudiced may never receive a fact-finding hearing by the Board or Suspension Official, even though it has submitted information that raises genuine disputes as to material facts.

Although the August 2, 1983, notice was valid when issued to effect a temporary suspension, the notice was inadequate to protect plaintiff's property and liberty interests because it failed to set a fixed time for a hearing by the Board to hear the contractor's version of the facts. The period from August 2, 1983, to September 26, 1983, when the Department of Justice Criminal Division gave advice as to the prejudicial effect of a hearing, on the facts of this case, is an unreasonable period to provide a hearing after an ex parte suspension. DAR §§ 1–606.3(c)(2), (5) and (6) are defective, because they fail to require the Suspension Official to fix a specific date to hear a contractor within a reasonable time after notice of suspension has been given ex parte.

### CONCLUSION

The August 2, 1983, notice was effective to temporarily suspend procurement action on the Air Force solicitations on which plaintiff had submitted bids. The August 2, 1983, notice was defective in that no provision was made to establish a date certain on which EMI's response would be heard.

The period of EMI's suspension has become and is unreasonable on the facts. Therefore, it is now invalid and may not be given further effect in Air Force procurements.

Defendant's motion for summary judgment is denied. Plaintiff's motion for a preliminary injunction now is moot. Plaintiff's request that a permanent injunction be entered to prohibit defendant from awarding the contracts outstanding on September 19, 1983, to anyone other than plaintiff, and to require defendant to award to plaintiff all contracts for which plaintiff is low bidder, is denied.

Air Force procurement officials responsible for further action with respect to the solicitations on which plaintiff has submitted bids and which were outstanding as of September 26, 1983, may proceed to process and award contracts on such solicitations in accordance with the requirements of law and regulation. The decisions of the Air Force procurement officials with respect to such solicitations may not be based on a consideration of the August 2, 1983, suspension notice, which as of September 29, 1983, is invalid and has no legal effect.