**NKF ENGINEERING, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**and**

**Weidlinger Associates, Intervenor.**

**No. 723–85C.**

United States Claims Court.

Feb. 27, 1986.

Keith L. Baker, Washington, D.C., for plaintiff. William A. Carey, David M.F. Lambert, and Barnett & Alagia, of counsel.

E. Kathleen Shahan, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. Mark Stempler, Dept. of the Navy, of counsel.

John W. McCormick, Norfolk, Va., for intervenor. Boyd, Payne, Gates & Farthing, of counsel.

## OPINION

WIESE, Judge.

Plaintiff NKF Engineering, Inc. ("NKF") brought this suit seeking injunctive relief barring the United States Navy from proceeding with an intended contract award to Weidlinger Associates ("Weidlinger"), the third party in the action. The dispute centers on the Navy's decision to disqualify NKF for award after that company had initially been selected as the apparent competitive winner in a negotiated procurement. The decision to disqualify was based upon the conclusion that NKF had obtained, or could be seen as having obtained, an unfair competitive advantage—reflected in its "best and final" offer to the Government—through its having hired, as a consultant, the former deputy director of the same Navy sub-group concerned with the contract award in question. Preservation of the integrity of the procurement process was thus thought to require NKF's disqualification.

Based upon findings of fact previously entered by the court in an order of December 30, 1985 [1] (reproduced, in part, as an appendix to this opinion) and the briefs thereafter submitted by the parties, the court entered an order on February 11, 1986 permanently enjoining the Navy from proceeding with a contract award to any offeror other than NKF. The order also provided instructions to the contracting officer with regard to any reexamination of the disqualification issue his office might deem appropriate to undertake. This opinion provides the reasons for that order in more detail.

### Facts [2]

On March 22, 1983, the Naval Sea Systems Command ("NAVSEA") issued Request For Proposals N00024–83–R–4175(Q) ("RFP 4175") calling for technical and cost proposals to provide engineering services in support of Navy ships and ship systems. The proposal request contemplated award of a cost plus fixed fee "level of effort" contract involving 110,000 hours of engineering services covering a range of technological disciplines relating to ship survivability.

RFP 4175 originated in the survivability and readiness sub-group of the hull engineering group of NAVSEA. This sub-group, identified in Navy code parlance as "SEA 55X", had as its deputy director a Mr. Yip Park—a civilian employee of the

---

1. Following the commencement of suit here, the Navy agreed to postpone the award in order to permit the matter to be decided on the basis of a full and complete record. The case was tried on the merits on December 19–23, 1985; on December 30, 1985, the court issued an order setting forth its findings of fact and establishing a briefing schedule.

2. The facts noted here repeat some but not all of the separate findings of fact which are set forth in the court's order of December 30, 1985.

Navy with approximately 30 years of experience in the field of weapons effects and ship survivability and protection.

Mr. Park had been designated the Contracting Officer's Technical Representative for RFP 4175. In addition, he had also been named chairman of the Contract Award Review Panel ("CARP"), the group charged with overseeing the contractor selection process. In these dual capacities—one as technical representative and the other as CARP chairman—Mr. Park's responsibilities included development of the following matters pertaining to RFP 4175: the evaluation plan pursuant to which the offerors' initial technical proposals were to be evaluated, the Government's estimates of the labor mix and the range of costs it considered reasonable, and the technical vs. cost weighting formula. Also, in his role as CARP chairman, Mr. Park learned the number of offerors who had chosen to participate in the procurement effort and their relative rankings following initial evaluation. More particularly, Mr. Park knew that of the five offerors involved, two—NKF and Weidlinger—had received nearly identical rankings on their technical proposals but stood over $2.5 million apart on cost with NKF being the higher of the two.

In late August of 1984, roughly one year after the initial round of proposals under RFP 4175 had been received and evaluated by the Government, Mr. Park announced his retirement from Government service. At about the same time, Mr. Park contacted several private companies concerning possible employment with them. One of these was NKF, where Mr. Park spoke with company president George Amir.

During the interviewing process, Mr. Amir asked Mr. Park to check with appropriate NAVSEA officials to verify that NKF's employment of Mr. Park would not create a conflict of interest. Although he in fact never checked, Mr. Park later informed Mr. Amir that he had received assurances from NAVSEA legal counsel. With this confirmation, Mr. Amir offered Mr. Park a non-exclusive consulting job, and they soon signed an agreement. At the time this agreement was entered into, neither Mr. Amir nor anyone else at NKF was aware that Mr. Park had any involvement with RFP 4175 beyond having knowledge of its technical requirements as stated in the "Scope of Work".

Some three months after Mr. Park began work with NKF, the contracting officer requested the submission of best and final offers under RFP 4175. Included as part of this request was an amendment to the solicitation, "Amendment 5", which substantially revised the Statement of Work contemplated for RFP 4175. Amendment 5 greatly increased the importance of a particular low-cost technical area of the work statement, and necessarily decreased the relative importance of the high cost technical areas. Both NKF and Weidlinger viewed Amendment 5 as requiring a sweeping revision of their initial proposals. The Navy too shared much the same sense of the situation. In-house documentation reveals that Amendment 5 became necessary to accommodate a "major increase of work in the 55X2 Division" that had not been planned for in the initial request for proposals. This change in requirements was aimed at restructuring the expected scope of work so as "to provide equal weighting of effort between 55X1 and 55X2 [the coordinate branches of 55X] * * *."

Also included in the request for a best and final offer sent to NKF was an attachment in which the Government identified aspects of NKF's initial cost proposal judged to be in need of reevaluation and improvement. The attachment clearly called for a reduction in all of the proposed costs mentioned. These suggestions, combined with Amendment 5's discernible emphasis on lower cost contract services, persuaded NKF that, in order to be competitive, its best and final cost proposal would have to be much lower than its initial proposal had been.

Thus alerted, NKF re-costed the entirety of its proposal, an effort that led to a price reduction from an initial proposal figure of $16.7 million to one of $11.2 million—a downward revision of approximately 33

percent. When all the procurement competitors submitted their best and final offers in March of 1984, this last proposal by NKF was the lowest. The other offerors too had reduced their final price, but none by more than 19 percent.

In the technical evaluations of the best and final offers, Weidlinger received the highest score, while NKF was rated second. However, when the CARP for RFP 4175 met and applied its predetermined weighting formula to both the technical and cost criteria, NKF received the highest overall score. Accordingly, on July 2, 1985, the CARP issued its final report recommending award to NKF.

Shortly after this report's issuance, the contract negotiator on RFP 4175 voiced his concern over a possible conflict of interest involving NKF. He discussed the problem with Mr. Ralph Mills, head of the contracts division responsible for RFP 4175 and supervisor of the contracting officer. Mr. Mills then reviewed the situation with a number of other NAVSEA officials and, with their concurrence, decided to disqualify NKF on the ground of conflict of interest.

The triggering event which led to this disqualification was NKF's submission of its best and final cost proposal. As noted, that proposal reflected a 33 percent decrease in NKF's initial pricing. Mr. Mills had never before seen a price swing as extreme as this. Because of Mr. Park's prior involvement in RFP 4175 as a NAVSEA employee, Mr. Mills considered the decrease suspicious, *i.e.*, that it was probably the result of Mr. Park's having passed on "inside" information to NKF. Mr. Mills concluded that this appearance of and potential for an unfair competitive advantage so tainted the procurement process that the integrity of the process had been damaged. In his view, the only way to eliminate the harm was to disqualify NKF. Consequently, the contracting officer announced a proposed award to Weidlinger, the second-highest bidder, by notice dated August 19, 1985.

NKF filed a protest of the proposed award to Weidlinger with the General Accounting Office on August 26, 1985. On December 9, 1985, GAO denied NKF's protest, and on the following day NKF filed its suit in this court.

*Discussion*

*A. Preliminary Issues*

■ To obtain injunctive relief in this court, a disappointed bidder must demonstrate that the injury complained of is not adequately redressable through a suit for damages, that considerations of public policy would not preclude the relief being sought, and that the procurement decision in question is irrational in fact or erroneous in law. *Keco Industries, Inc. v. United States*, 492 F.2d 1200, 1203–04, 203 Ct.Cl. 566, 574–75 (1974); *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1298–99, 1301 (D.C.Cir.1971). Of these three areas of concern, the first two were resolved in the contractor's favor in the order entered by the court on December 30, 1985 [3]; what remains for consideration at this point is the question whether the contracting officer's decision to disqualify NKF is subject to defeat under the narrow grounds for invalidation permitted in these matters.

■ We observe at the start that it is the contractor seeking relief who bears the burden of proof in overturning a contracting officer's decision. Therefore, in the usual case, the contractor's arguments would mark the appropriate starting point. In this instance, however, intervenor Weidlinger has advanced a set of contentions which, if upheld, would foreclose the contractor's right to any consideration of its case on the merits. Specifically, Weidlinger contends that the doctrine of "unclean hands" and the doctrine of waiver are each applicable here as bars to the equitable relief plaintiff seeks. Necessarily, then, we begin with these contentions.

■ This court has recognized that "[i]t is one of the fundamental principles upon

3. See Appendix, Findings of Fact 44–46.

which equity jurisprudence is founded, that before a complainant can have a standing in court he must first show that not only has he a good and meritorious cause of action, but he must come into court with clean hands." *Dyn Logistics Services, Inc. v. United States*, 6 Cl.Ct. 353, 360 (1984), quoting *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 244, 54 S.Ct. 146, 147, 78 L.Ed. 293 (1933). The unclean hands doctrine requires that a court deny equitable relief to a plaintiff "tainted with inequitableness or bad faith relative to the matter in which he seeks relief * * *." *Id.*, quoting *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945).

██ The allegation which Weidlinger raises is that Mr. Park's negotiation with NKF and the employment agreement he signed with that company were activities engaged in while he still held his Government positions with respect to RFP 4175. It is argued that Mr. Park's conduct thus placed him in direct violation of the conflict-of-interest prohibitions identified in the Ethics in Government Act, 18 U.S.C. § 208 (1982). The violation would consequently taint NKF for its negligence (in not discerning Mr. Park's relationship to RFP 4175) culpability as a participant in that same wrongdoing.

Section 208 of the Ethics in Government Act imposes criminal liability on Government officials who act in their official capacities when they are subject to a conflict of interest. The section reads in relevant part as follows:

(a) Except as permitted by subsection (b) hereof, whoever, being an officer or employee of the executive branch of the United States Government * * * participates personally and substantially as a Government officer or employee * * * in a * * * contract * * * in which, to his knowledge, he * * * or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest—

Shall be fined not more than $10,000, or imprisoned not more than two years, or both. [18 U.S.C. § 208(a) (1982).]

In the present case, Mr. Park first entered into employment negotiations with NKF in late August 1984. Nevertheless, he maintained his dual status as the CARP chairman and the Contracting Officer's Technical Representative ("COTR") on RFP 4175 until his retirement from Government service on September 30, 1984. The issue at hand is whether his retention of these positions during the intervening month—the same month during which he contacted and agreed to employment with NKF—constituted a violation of section 208.

NKF contends that Mr. Park committed no section 208 violation because he did not participate "personally and substantially" on RFP 4175 after he began talking to prospective future employers. Indeed, several Government witnesses testified at trial that RFP 4175 was "on the back burner" during September of 1984, and, in fact had been in an inactive status for several prior months. There seems to be little doubt that RFP 4175 was not a subject of any active concern either by Mr. Park or anyone else at NAVSEA during the August-September 1984 period.

Nevertheless, the inquiry does not end there. The fact that RFP 4175 was not an administratively active procurement does not preclude a finding that Mr. Park was personally and substantially involved in that matter. Indeed, considering that the concern of the statute is to avoid the temptation or opportunity for self-dealing, it would make little sense to limit the reach of the statute only to currently active matters. So long as an individual has or can be seen as having the power to influence the conduct of the Government's business in his charge, the prohibitions of the statute come into play. The regulations of the Office of Personnel Management express the same thought this way: to participate " '[s]ubstantially' means that the employee's involvement must be of significance to the matter, *or form a basis for a reasonable appearance of such significance.*" 5

C.F.R. § 737.5(d)(1) (1985) (emphasis added).[4]

This latter portion of the quoted regulation indicates that a court should use an objective test in determining whether an employee's participation in a matter is "substantial". That is, a particularized inquiry into the existence of actual involvement is unnecessary if there is some objective fact which reasonably implies such actual involvement. In this case, Mr. Park's titles clearly constitute such an objective fact; one would presume that the involvement of the CARP chairman and the COTR would be "significant" to the procurement. Hence, under the terms of the regulation, Mr. Park's status and conduct would bring him within the ambit of section 208.

There remains to be considered, however, one critical fact which we believe negates the reasonableness of an inference that Mr. Park's involvement was significant. That fact is that Mr. Park had announced his impending retirement from Government service *before* he engaged in any employment negotiations with private companies. Indeed, his retirement was a matter of common knowledge within the particular NAVSEA contracting community. Thus Mr. Park's recognized status was not that of CARP chairman and COTR, but that of *retiring* CARP chairman and COTR. It would have been generally understood that Mr. Park's future efforts in his Government position would be of minimal importance (as, in fact, they were). Hence, his titles were recognizably empty of meaningful authority, and as such could not be a "basis for a reasonable appearance" of significant involvement.

Under the terms of the regulation then, Mr. Park's involvement in RFP 4175 in September of 1984 was not "substantial", and his conduct did not run afoul of the Ethics in Government Act. It follows from this that NKF was not party to any criminal violation, and cannot be considered tainted with wrongdoing or bad faith. The unclean hands doctrine therefore does not preclude the granting of equitable relief in this case.[5]

■ Weidlinger's arguments relying on the doctrine of waiver require less discussion. The intervenor asserts that NKF's failure to acquire the Government's written approval before hiring Mr. Park constitutes a waiver of NKF's right to protest the consequence of that hiring, namely NKF's disqualification from RFP 4175. This contention would have force if some rule or regulation imposed a duty to obtain such prior written approval. However, no requirement to this effect exists.

Weidlinger attempts to glean such a requirement from several sources, the most apt of which is a portion of the RFP itself: "[a]ny explanation desired by an offeror regarding the meaning or interpretation of the solicitation, drawings, specifications, etc. must be requested in writing and with sufficient time allowed for a reply to reach offerors before the submission of their offers." While this language does contemplate written requests for explanations, it pertains only to questions concerning the technical substance of the procurement. Neither the section quoted, nor the other possibilities Weidlinger also relies upon, require written requests for approval in hiring matters. NKF, therefore, has not

---

**4.** The quoted regulation implements § 207 of the statute, and not § 208 which concerns us here. However, the statutory language is the same, *compare* 18 U.S.C. § 207(a)(3) *with* 18 U.S.C. § 208(a), and we see no reason why the regulation should not be equally pertinent in interpreting § 208.

**5.** We note that the absence of the statutory violation also prevents the doctrine enunciated in *United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), from requiring plaintiff's disqualifica-

tion. That case held that any contract tainted by the violation of a conflict of interest statute is subject to disaffirmance, in order to fully effect the purpose of the legislation. *Id.* at 563–66, 81 S.Ct. at 315–18. But in the absence of the statutory violation, the contract is not infected and remains enforceable. *CACI, Inc.-Federal v. United States,* 719 F.2d 1567, 1581 (Fed.Cir. 1983). Thus the lack of any Ethics in Government Act violation here by Mr. Park means that a contract with NKF would not be assailable under *Mississippi Valley.*

waived its right to challenge its disqualification. Accordingly, we proceed to a review of the merits of the contracting officer's decision.

## B. *The Contracting Officer's Decision*

As noted in the beginning of this discussion, in order to obtain injunctive relief from the contracting officer's decision, NKF must demonstrate the decision to be erroneous in law or irrational in fact. NKF challenges its disqualification on both of these grounds.

■ NKF argues first that the decision was legally erroneous because the contracting officer lacked authority to disqualify a bidder based on the reasons that were given here, namely, to protect the integrity of the procurement process from the appearance of and potential for an unfair competitive advantage. The court observes that these grounds are not among those listed in the Federal Acquisition Regulations as causes for contractor suspension or debarment. *See* 48 C.F.R. §§ 9.406–2, 9.407–2 (1985). Moreover, neither Mr. Park nor NKF has violated any provision of the Ethics in Government Act, which arguably addresses the full range of conduct which Congress intended to prohibit in this context. Indeed, the court knows of no rule of law which explicitly authorizes a contracting officer to disqualify a contractor who has received inside information, as alleged here.

Despite the seeming absence of any authority expressly authorizing the actions that were taken in this case the court is of the view that the contracting officer's responsibility of "safeguarding the interests of the United States in its contractual relationships", 48 C.F.R. § 1.602–2 (1985), is sufficient to support the exercise of authority that was asserted. What persuades us to this view is the latitude the courts have historically shown with respect to the contracting officer's basic authority to enter into, administer, or terminate contracts, *see, e.g., Arthur Venneri Co. v. United States,* 381 F.2d 748, 750, 180 Ct.Cl. 920, 924–25 (1967); *Sperry Flight Systems Division v. United States,* 548 F.2d 915, 921,

212 Ct.Cl. 329, 339–40 (1977), and the overriding importance of the Government's need to insure full and fair competition in the conduct of its procurements. A procurement system powerless to rid itself of an unfair competitive advantage gained through inside information would soon lose every vestige of competitiveness. There can be no question, therefore, that the contracting officer had authority to act upon his concerns and, in an appropriate case, to cause the disqualification of a bidder.

This last then brings us to NKF's second contention. The argument is that, assuming the contracting officer had authority to disqualify NKF, nevertheless, he acted upon an inadequate basis in doing so.

■ In considering this contention, we note initially a problem of identifying the specific grounds upon which the contracting officer actually based his decision. In its briefs the Government takes the position that the disqualification of NKF rested exclusively on the "appearance of impropriety" (namely NKF's hiring of Mr. Park) and it now stakes its case squarely on that proposition. But to the court, the contracting officer's position seemed not so limited. Fairly read, the substance of his trial testimony would be that his decision to disqualify NKF rested on both the appearance of an impropriety *and* his belief that an impropriety had actually occurred (the communication of privileged Government information to NKF by Mr. Park as evidenced by the significant decrease in the company's bid). Since the basis for the disqualification does not appear as clear cut as the Government asserts, and since a disqualification on either ground raises important concerns, we address both. We consider first whether the mere appearance of impropriety is in and of itself a sustainable basis for the disqualification of an otherwise responsive and responsible bidder.

The answer is that it is not. The leading case on this question is *CACI, Inc.-Federal v. United States,* 719 F.2d 1567 (Fed.Cir. 1983). The plaintiff there was a disappointed bidder who sought to enjoin the

proposed award of a data processing contract by the United States Department of Justice. The vice president of the apparently successful bidder had previously been a Department of Justice employee, and had had prior social or professional relationships with four of the five members of the Technical Evaluation Committee for the procurement. Contending that these relationships led to favoritism and a conflict of interest on the part of the Government officials, the plaintiff (CACI) came here seeking an injunction of the proposed award.

The Claims Court granted the injunction, and the Court of Appeals reversed, delineating what we believe to be the standard governing the present case:

> [w]e conclude that the Claims Court ruling that the Department's award of the contract to Sterling would be "arbitrary, capricious, and an abuse of discretion" because of the possibility and appearance of impropriety is not supported by the record and therefore is not a proper basis for enjoining award of the contract. The Claims Court based its inferences of actual or potential wrongdoing by the Department on suspicion and innuendo, not on hard facts. [*CACI*, 719 F.2d at 1581–82.]

The Court of Appeals thus clarified that the mere appearance of impropriety, without "hard facts" inferring actual misconduct, was an inadequate basis for withholding award of the contract.

We recognize that, factually speaking, the *CACI* court confronted a different type of impropriety than is involved in the present case. There, an imagined favoritism by Government officials was the grievance for which the disqualification was sought, while here it is the mere possibility of a bidders' receipt of inside information that is the harm sought to be avoided. However, the court ascertains no persuasive reason to distinguish between these two situations. In either case, a balanced concern for the integrity of the Government's procurement process demands that actions as economically severe

as bidder disqualification be based on more than unfounded apprehension.

Additionally, the court is unconvinced that in the present context the appearance of an impropriety is any more likely to have ripened into an actual impropriety than it was in the *CACI* situation. It is certainly reasonable to believe that an employee possessing confidential information can refrain from divulging his knowledge to his co-workers. Our statutory predecessor the Court of Claims recognized this in *Kesselhaut v. United States*, 555 F.2d 791, 214 Ct.Cl. 124 (1977), where it held that adequate screening procedures could prevent the employment of a former Federal Housing Administration lawyer from necessitating disqualification of his entire law firm in its representation of a claim before that agency. The court reasoned that disqualification of the entire firm was inappropriate "when truly unethical conduct has not taken place and the matter is merely one of the superficial appearance of evil, which a knowledge of the facts will dissipate." *Id.* at 793, 214 Ct.Cl. 128.

*Kesselhaut* thus cautions against presupposing that Mr. Park disclosed inside information to NKF. The decision also supports our conviction that the *CACI* rule should apply to the present facts. We therefore conclude that the mere appearance of impropriety is an improper basis for disqualifying a bidder from a Government procurement. *CACI* requires that the contracting officer base his decision on "hard facts" from which he can reasonably infer that an actual impropriety has occurred. This standard does not, of course, demand conclusive proof. Rather, the contracting officer must believe in his own mind that a wrongdoing has taken place. But to that end, he must rely upon some set of objective facts and not simply "suspicion or innuendo". Thus, to the extent that the contracting officer here based his decision on mere appearance, he was incorrect as a matter of law.

■ The court next considers the soundness of the second basis for the contracting officer's decision—the belief that an actual

impropriety had occurred. As the preceding analysis indicates, this is a valid ground for disqualification under *CACI*, provided that a contracting officer base his decision on hard facts and that his conclusion be rational.

In his testimony at trial, the contracting officer explained that the disqualification of NKF was triggered by the magnitude of its price decrease and by the fact that it had hired Mr. Park—an individual who was intimately familiar with RFP 4175. These two nearly simultaneous events persuaded the contracting officer that inside information had in fact been communicated[6], and an actual impropriety had thus occurred.

■ Clearly, NKF's significant price drop and Mr. Park's past unique relationship to the procurement process are "hard facts" within the meaning of the *CACI* decision. And were these the only facts bearing on the matter, there could be no question that a contracting officer might rationally conclude, as this contracting officer apparently did, that the Government's right to confidentiality had been breached. But the sticking point in this case, and what here condemns the contracting officer's decision, is that he failed to take into consideration critically important facts, all available to him at the time he made his decision and all of which cut the other way. A decision that fails to consider all relevant evidence is the essence of arbitrariness. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). We have such a decision here.

The court has previously identified in its Findings of Fact a number of factors relevant to NKF's disqualification which the contracting officer did not consider in his decision. These factors support NKF's contention that it formulated the substantial revisions in its best and final offer independent of any input from Mr. Park, and they should not have been neglected in the decision-making process.

For example, the contracting officer failed to consider that Amendment 5 to the RFP was added to the statement of work after Mr. Park departed from the Government, and that Amendment 5 constituted a major shift in the procurement's emphasis—a shift which, from a knowledgeable contractor's standpoint, clearly dictated a major price decrease. Indeed, NAVSEA's own internal documents characterize Amendment 5 as a "significant modification" of the RFP, and in a letter to NAVSEA Weidlinger described Amendment 5 as requiring "a massive rewrite of the technical proposal * * * and a complete recosting * * *."

Additionally, the contracting officer did not consider that had the bidders' best and final offers been evaluated by the technical/cost weighting formula in place during Mr. Park's tenure at NAVSEA, Weidlinger and not NKF would have received the highest score. Also ignored was the fact that NKF's price decrease was in an amount far more than that necessary to overcome Weidlinger's initially favorable cost position.

■ These facts, as well as others stated in the appendix to this decision, are highly relevant to the question of whether NKF's best and final offer reflected a receipt of inside information. In neglecting to include them in his assessment of the situation, the contracting officer failed to consider "relevant factors" in making his decision. His action was thus arbitrary and capricious, and his inference of actual impropriety was not reasonable. He there-

---

**6.** Weidlinger argues that the contracting officer was entitled to conclude as a matter of agency law that NKF possessed any information that Mr. Park did. Weidlinger quotes the Restatement of the Law of Agency for the proposition that "[s]ince the mind of the agent cannot be divided into compartments, the principal should be bound by whatever knowledge the agent has, irrespective of its source or time of acquisition

* * *." Restatement (Second) of Agency § 276 comment a (1958). That very sentence, however, continues and ends with this qualification: "unless it is the kind of knowledge which the agent can properly disregard in the specific case because of having acquired it confidentially." *See also id.* § 281 (principal not affected by knowledge of agent who is privileged not to disclose that knowledge).

fore did not have a proper basis under *CACI* for disqualifying NKF, and this decision must be overturned. Accordingly, the court grants NKF's motion to enjoin the contracting officer from awarding the contract to any offeror other than NKF.

### C. *The Remand Issue*

■ Having decided that the contracting officer's decision to disqualify NKF was legally unsound, there remains the question of what direction the case should take from this juncture. The court's analysis thus far leaves open the question of whether NKF may still be disqualified from RFP 4175 on proper grounds. Under the standards recited in this opinion, that question turns on whether NKF actually received inside information from Mr. Park. The court must now decide who, as between itself and the contracting officer, should make this dispositive finding.

At the outset, the court observes that the determination which remains to be made is one of factual inference. It is not a question of law, and as such, not one in which the court may substitute its judgment for that of the administrative decision maker, *see Dynamics Corp. of America v. United States*, 389 F.2d 424, 429, 182 Ct.Cl. 62, 71–72 (1968). Rather, it is the kind of judgment question which we believe properly belongs within the discretion of the contracting officer. His discretion is broad, and a necessary corollary of that breadth is that the court refrain from usurping his authority in the wake of his error. The normal practice in such circumstances is to remand to enable the agency to enter a new decision which remedies the defects in the original action. *See Williams v. Washington Metropolitan Area Transit Commission*, 415 F.2d 922, 939–40 and n. 87 (D.C.Cir.1968), *cert. denied*, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969). *See also Nederostek v. Adams*, 449 F.Supp. 286, 290 (D.D.C.1978) (if agency acts arbitrarily by making a judgment without considering a relevant factor the remedy is to send matter back in light of missing consideration).

NKF urges the court to decide the remaining fact question itself. It cites the court to cases such as *Towne Realty, Inc. v. United States*, 1 Cl.Ct. 264 (1982), which states that a court need not remand factual questions "where the evidence in the record points to only one conclusion * * *." *Id.* at 268–69 n. 4. That is not the situation here, however. The record in this case rationally permits a decision in either direction concerning whether Mr. Park communicated any information to NKF.' *Towne Realty* and the other cited cases therefore do not control the present circumstances.

NKF also relies upon the fact that the court previously stated as one of its Findings of Fact that NKF received no information from Mr. Park. NKF contends that upon remand the contracting officer would have no discretion to contravene this finding, and that a remand is therefore unnecessary. The court observes, however, that it made its Findings of Fact immediately after trial and before receiving the parties' briefs on the legal issues involved here. The court now recognizes that finding to be unnecessary to the correct legal disposition of the case, and thus considers it simply a gratuitous observation which the contracting officer is free to disregard. Hence, nothing constrains the court from properly remanding this matter to the contracting officer, and we do so with the instructions set forth at the end of this discussion.

Before leaving the subject of further proceedings in this action, the court addresses one final point raised by NKF. The plaintiff argues that, should the court remand the case to the contracting officer and should he again disqualify NKF, the case must then be referred to the Small Business Administration (SBA). NKF contends that the previously enunciated grounds for its disqualification implicate its business integrity, and that the decision to disqualify therefore falls within the scope of the 1977 amendments to the Small Business Act, 15 U.S.C. § 637(b)(7)(A) (1982). That provision prohibits a Government procurement officer from precluding a small busi-

ness concern from a contract award on grounds concerning "integrity", among other things, without referring the matter to the SBA. *See id.* NKF maintains that its integrity is implicitly at issue in this case, and that its disqualification would thus necessitate referral to the SBA.

 While a casual reading of the statute would suggest that NKF's assertion has merit, NKF's argument ignores the prior decisions in this court interpreting the statute. In *Siller Brothers, Inc. v. United States,* 655 F.2d 1039, 228 Ct.Cl. 76 (1981) our statutory predecessor, the Court of Claims, considered in detail the intended breadth of 15 U.S.C. § 637(b)(7)(A). After reviewing the legislative history, the court concluded that referral to the SBA was unnecessary where the contractor's disqualification was not a consequence of its small business status. *See id.* at 1042–44, 228 Ct.Cl. at 81–83. That is, the challenge to the bidder's integrity must stem from its certification as a small business concern. *See Electro-Methods, Inc. v. United States,* 3 Cl.Ct. 500, 508 (1983), *aff'd in part and rev'd in part on other grounds,* 728 F.2d 1471 (Fed.Cir.1984) (referral to SBA for finding on integrity unnecessary where status as small business enterprise is not the cause of suspension). In the present case, any implicit challenge to NKF's integrity would similarly be unrelated to its small business status, and the statute would therefore not apply. Hence the contracting officer need not refer this case to the SBA if, upon remand, he decides to reexamine NKF's disqualification.

### D. *Instructions*

Having determined that the case should be remanded to the contracting officer for his reevaluation, the court considers it appropriate to restate its legal conclusions in the form of guidelines. First, the contracting officer is enjoined from awarding RFP 4175 to any offeror other than NKF. This restraint shall remain in place until the contracting officer either (i) reexamines NKF's disqualification pursuant to the instructions below, or (ii) proceeds with a resolicitation of best and final offers from all interested parties.

Second, assuming the contracting officer adopts the former option and reexamines NKF's disqualification, he must do so according to correct legal principles. This means, for one thing, that in his next decision he may not disqualify NKF on the naked ground of an appearance of impropriety. He may disqualify NKF only if he decides on the basis of *all* relevant facts (including those in Finding of Fact 47) that NKF's bid was tainted by inside information improperly disclosed to the company by Mr. Park. He is expected to carefully consider all reasonable evidence bearing on the question of whether an improper disclosure of information occurred. And before disqualifying a contractor he must conclude, in his own mind, that it is more likely than not that the suspected bid was influenced by impermissibly acquired information. The contracting officer's conclusion should be well considered, supported by sound reasoning, and susceptible to clear articulation. Fairness in the evaluation of a contractor's bid demands no more and permits no less.

Third, in lieu of reexamining the issue of NKF's disqualification (or perhaps even after conducting such a reexamination), the contracting officer may put aside all the offers received and call for another round of best and final offers, with each participating offeror being made aware of the pricings and rankings that resulted from the two prior rounds of offers. Through the disclosure of this information, much of the confidential information reposed in Mr. Park would presumably be offset.

Finally, before concluding, the court wishes to add a word of observation. We believe that the contracting officer could have averted much, if not all, of the present controversy had NKF been given an opportunity to respond to his concerns before he made his decision to disqualify. The error here was in not considering all of the relevant facts; had NKF been consulted in a timely fashion the company could readily have provided the information

which has since been so costly obtained. We do not mean to imply that NKF had any due process rights here which required notice and an opportunity to be heard.[7] Rather, we merely recommend these added procedural protections as a likely means of avoiding complex litigation in future procurements. Had such minimal precautions been taken here, much time, money, and effort would have been saved and the procurement process itself better served.

### Conclusion

Consistent with the foregoing, IT IS ORDERED that NAVSEA is permanently enjoined from awarding the contract at issue to any offeror other than NKF, until such time as the contracting officer reconsiders his decision. The matter is remanded to the contracting officer for his further action. The Clerk shall enter judgment accordingly.

### APPENDIX

The following findings of fact are taken from the post-trial order which the court entered in this case on December 30, 1985.

1. SEA 55X is the survivability and readiness sub-group of the hull engineering group of the Naval Sea Systems Command ("NAVSEA"), United States Department of the Navy.

2. On August 13, 1982, SEA 55X issued Procurement Request N00024–82–PR–39411 ("PR 39411"), calling for technical and cost proposals to provide engineering services to support Navy ships and ship systems in the areas of ship and submarine survivability, ship signatures, vibration and noise, fire protection, damage control and safety. The request contained a break-down of the Government's cost estimate for the requirement as it was known at the time. Mr. Yip Park, then the deputy head of SEA 55X, signed PR 39411 as project engineer. On January 6, 1983, SEA 55X issued a companion Procurement Request, N00024–83–PR–39382 ("PR 39382"), which Mr. Park also signed.

3. On March 22, 1983, NAVSEA issued Request for Proposals N00024–83–R–4175(Q) ("RFP 4175") for the services required by PR 39411. Mr. Park was listed on RFP 4175 as the contracting officer's technical representative ("COTR"). The procurement was designated as a set-aside for small business and was structured to be awarded as a cost-reimbursable, fixed-fee contract. RFP 4175 calls for 110,000 manhours of professional engineering and technical services to be performed on a "level of effort" basis, with two sequential option periods of one year each, both for an additional 110,000 manhours of engineering services.

4. On March 22, 1983, NAVSEA also issued Request for Proposals N00024–83–R–4295 ("RFP 4295") for the services required by PR 39382.

5. NAVSEA Instruction 4200.10 (April 27, 1979) prescribes the procedures for the competitive selection of sources for other than major defense systems. In paragraph 3.b. it recommends the use of a Contract Award Review Panel (CARP) to ensure the objectivity of the selection process. Paragraph 5 of the instruction describes the CARP's responsibilities, which include the requirement to review and approve evaluation criteria; establish weighting and ranking factors prior to receipt of proposals; analyze the technical, managerial and pricing aspects of proposals; establish the com-

---

**7.** We do not stop to consider the factual accuracy of plaintiff's contention that the disqualification puts its "integrity" at stake, thereby involving due process requirements. It is enough to say that, even if that were so, there surely was no want of due process at the administrative level. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) *quoting Arm-* strong *v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). The protest procedures before the General Accounting Office to which NKF resorted before coming here were certainly sufficient to satisfy any due process requirements inherent in plaintiff's disqualification. *See* 31 U.S.C.A. §§ 3551–3556 (West Supp. 1985) (providing for automatic stay of award and subsequent administrative review upon filing of protest with GAO).

petitive range; evaluate proposals, and review the recommendation of award.

6. The contracting officer, at that time Mr. Jack Warren, designated a contract negotiator, Mr. John Dennard, to evaluate the cost proposals and advise the CARP on the strengths and weaknesses of the cost proposals. Mr. Dennard was also designated to be a member of the CARP.

7. On May 16, 1983, a Technical Evaluation Review Panel (TERP) was appointed for RFP 4175 and RFP 4295 by Captain F.S. Hering, who was at that time head of the survivability and readiness sub-group (SEA 55X). The TERP is an advisory body to the CARP that reviews the technical proposals in accordance with the solicitation and the evaluation plan. It also prepares a detailed report of the strengths and weaknesses of each of the proposals. In this instance, the chairman of the TERP was also a member of the CARP.

8. On May 24, 1983, five contractors submitted proposals to NAVSEA in response to RFP 4175. Among these were plaintiff, NKF Engineering, Inc. ("NKF") and Weidlinger Associates, Inc. ("Weidlinger"). The TERP evaluated the technical proposals and the contract negotiator evaluated the cost proposals. On the same date, proposals were also received in response to RFP 4295.

9. On August 8, 1983, Captain Hering sent a memorandum prepared by Mr. Park to the contracting officer for his approval. The memorandum revised the evaluation plan, including the technical weights, for RFP 4175.

10. On October 11, 1983, the TERP for RFP 4175 issued its report on the initial evaluation of proposals submitted in response to the RFP. The TERP report on RFP 4175 rated Weidlinger highest in each of the three technical factors and highest overall in its technical proposal with a score of 234.01. NKF was rated second to Weidlinger in each of the technical factors and second overall in its technical proposal with a score of 227.34.

11. In the separate evaluations of the cost proposals, Weidlinger placed second; NKF placed fifth.

12. On October 11, 1983, Mr. Park provided the contract negotiator, Mr. Dennard, with the Government's estimated "labor mix" for RFP 4175 and RFP 4295. The labor mix represents the Government's estimate of the amount of contract services (expressed in percentages) that it expects to require from each of the several labor categories described in the request for proposals.

13. On October 26, 1983, Captain Hering signed a memorandum prepared by Mr. Park confirming the identity of the CARP members for RFP 4175 and RFP 4295. Mr. Park was listed as CARP Chairman for both RFPs. The other members were Mr. Ralph Holmes, Mr. S. Tatigian, Mr. Ben Leotta and Mr. Dennard. The memorandum also referenced the October 11, 1983, TERP reports on the results of the initial evaluation of proposals that had been submitted under RFP 4175 and RFP 4295, and confirmed the relative weight of the technical and cost criteria. On October 27, 1983, Mr. Park wrote a route sheet sending the memorandum of October 26, to Mr. Dennard.

14. As Chairman of the CARP for each procurement, Mr. Park had knowledge of the Government's recommended labor mixes, the Government estimates of the cost ranges considered reasonable, the specific questions used by the TERP in evaluating the technical proposals and the weights NAVSEA assigned to the technical and cost aspects of the proposals.

15. In late 1983, it was decided that further consideration of the initial proposals under RFP 4175 should be deferred until an award under RFP 4295 had been accomplished.

16. In February 1984, the CARP met on RFP 4295 to review and discuss the TERP report on the offerors' technical proposals and the contract negotiator's report on the cost proposals. Also mentioned at this same meeting were the relative standings of the offerors' initial technical and cost

proposals for RFP 4175. Specifically, Mr. Dennard (the contract negotiator) stated that, although the technical scores for NKF and Weidlinger were very close and significantly higher than those of the other offerors, NKF's cost proposal was the highest submitted and near the outside limit of the range the Government considered reasonable. Mr. Dennard informed the group that the cost difference between the two was approximately $2.5 million. Mr. Park was present for this entire meeting.

17. On February 23, 1984, requests for best and final offers ("BFOs") were issued to all offerors who had submitted proposals under RFP 4295. The CARP's report on the BFOs was completed on June 7, 1984, and a second round of requests for BFOs was issued on June 18, 1984. After a disappointed bidder's unsuccessful appeal of NKF's size status to the Small Business Administration, a contract was awarded to NKF under RFP 4295 on September 25, 1984.

18. NKF's BFO on RFP 4295 decreased its original offer by 12.9 percent. The second BFO represented a final price decrease of 13.4 percent.

19. On or about the end of August or the beginning of September 1984, Mr. Park called Mr. George Amir, President of NKF, to set up an interview for possible employment. He told Mr. Amir that he had announced his retirement from the Government and was contacting several companies.

20. Mr. Amir asked Mr. Park to check with appropriate NAVSEA officials including NAVSEA legal counsel to verify that NKF's employment of Mr. Park would not create a conflict of interest. Although Mr. Park later informed Mr. Amir that he had checked with NAVSEA legal counsel, in fact, he had not done so.

21. On September 10, 1985, Mr. Park met with Mr. Amir to discuss potential employment and Mr. Amir told him that he (Amir) would check with NKF managers to see whether NKF could use Mr. Park's technical abilities.

22. On September 13, 1984, Mr. Park signed a non-exclusive consulting agreement with NKF Engineering, Inc.

23. In late September 1984, Government officials were advised that Mr. Park had entered into a consulting agreement with NKF.

24. Because of his imminent retirement, Mr. Park was replaced as Chairman of the CARP for RFP 4175 on September 26, 1984, by Mr. Greg Hagedorn. Mr. Park retired from NAVSEA effective September 30, 1984.

25. On October 1, 1984, Mr. Park signed a "Consultant Innovation and Proprietary Information Agreement" whereby he agreed, in part, "not to disclose or utilize in my work with the company any secret or confidential information of others." Mr. Park became a consultant to NKF in technical matters involving naval ship and submarine survivability.

26. Following Mr. Park's retirement and replacement, the CARP for RFP 4175 met with its new chairman. Among other things, the CARP determined that all five offerors were in the competitive range and that written discussions should be held with each of them.

27. Additionally, the CARP concluded that it was not within its cognizance to make decisions on issues involving the possibility of organizational conflicts of interest. Nevertheless, in an attempt to neutralize any potential competitive advantage NKF might have gained by employing Mr. Park, the CARP revised and rewrote the evaluation plan for RFP 4175. Specifically, the CARP:

(a) revised and reissued the source selection plan,

(b) modified the evaluation criteria,

(c) changed the weights of the evaluation criteria, and

(d) changed the weights of the technical factors within the technical criteria.

28. By letter dated January 16, 1985, the Contracting Officer, Palmer Lloyd, requested best and final offers under RFP

4175. The request for best and final offers included Amendment Five which substantially revised the Statement of Work for RFP 4175. Amendment 5 added to and expanded the single "Technical Area" in the scope of work entitled "Damage Control, Firefighting and Safety" into five distinct Technical Areas. Correspondingly, this increased the description of expected tasks from an original ¾ page itemization to 2½ pages.

29. The request for best and final offer sent to NKF on January 16, 1985, contained an attachment entitled "Cost Questions/Deficiencies Applicable to NKF Engineering Associates, Inc.". This attachment identified aspects of NKF's initial cost proposal which the Government felt were in need of adjustment. The Government's comments included the following:

(a) overall direct cost is greatly overstated,

(b) fixed fee proposed for the prime and subcontractors is totally unacceptable,

(c) proposed manhours for senior engineers are overstated and engineer hours are understated,

(d) escalation for prime and subcontractors should not exceed 5 percent for any year.

30. On or before March 12, 1984, NKF, and the other offerors from whom best and final offers had been requested, submitted best and final proposals. NKF's best and final cost proposal contained a total estimated cost of $11.2 million, and reflected four major changes:

(a) "Other Direct Costs" were greatly reduced,

(b) the fixed fee proposed for both NKF and its subcontractors was reduced,

(c) the proposed manhours for the top two engineer categories were reduced and the bottom two engineer categories were reduced with an overall lowering of labor rates, and

(d) four subcontractors were added to cover the additional technical areas required by the statement of work, and hours were shifted away from other subcontractors so as to stay within the overall 110,000 manhour requirement.

31. The TERP evaluation of the BFO proposals resulted in Weidlinger being rated highest in the technical criterion and highest in each of the technical factors and NKF being rated second.

32. NKF's estimated cost in its BFO decreased by about 33 percent from the proposal NKF had initially submitted, thus changing NKF's estimated costs from the highest to the lowest of the offerors. NKF's original proposed cost was $16.7 million; the best and final offer was $11.2 million.

33. The CARP met, reviewed the TERP and cost evaluation reports, and applied the weights to the technical and cost criteria for RFP 4175. On July 2, 1985, the CARP issued its final report recommending award to NKF on the basis of total point scores.

34. The weighting formula which the CARP applied allowed 60 percent for technical considerations and 40 percent for cost considerations. This formula represented a change in the weighting scheme introduced subsequent to Mr. Park's departure from the Government. (See Finding 27.) The previous formula weighted technical 80 percent and cost 20 percent; had this formula been applied in the evaluation of the best and final offers, Weidlinger, rather than NKF, would have received the highest point total. Specifically, the respective scoring would have been 73.74 for Weidlinger and 73.55 for NKF. Under the 60–40 formula which was actually applied, NKF scored 80.16 and Weidlinger scored 77.25.

35. After the CARP had issued its final report recommending award to NKF, Mr. Dennard spoke with Mr. Ralph Mills, head of the contracts division responsible for RFP 4175 and supervisor of the contracting officer (who was then Mr. J. Palmer Lloyd) regarding a possible conflict of interest involving NKF.

36. Mr. Mills reviewed the situation concerning RFP 4175 with CARP members

and, with the concurrence of Mr. Lloyd, Mr. Edward Saul, legal advisor, Mr. Hagedorn, and Mr. Dennard, determined that NKF should be disqualified on the basis of a conflict of interest because of the unfair competitive advantage NKF may have gained by employing Mr. Park as a consultant available full-time for the performance of the contract.

37. Specifically, Mr. Mills determined that there was a potential for an unfair competitive advantage inherent in NKF's hiring of Yip Park because Mr. Park:

(a) had generated the procurement request that culminated in RFP 4175,

(b) had developed the technical evaluation plan pursuant to which the initial proposals were evaluated,

(c) had established the guideline labor mix for the contract,

(d) had generated the Government's cost estimate for the contract,

(e) knew the technical/cost weighting formula, and

(f) knew the number of participating offerors and their relative rankings including the fact that NKF and Weidlinger were close technically but were approximately $2.5 million apart in cost.

38. NKF's best and final cost proposal was approximately 33 percent lower than its original proposal. Mr. Mills had never before seen a price swing as extreme as this. Because of Mr. Park's prior involvement in RFP 4175 (as outlined in Finding 37), Mr. Mills found NKF's price decrease suspicious. He concluded that this appearance of and potential for an unfair competitive advantage so tainted the competitive process that the integrity of the procurement had been damaged and the only way to eliminate the damage would be to hold NKF ineligible for award.

39. The determination to disqualify NKF was reviewed by Captain William Hauenstein, Deputy Commander for Contracts, NAVSEA; and Vice Admiral William Rowden, Commander, NAVSEA; and concurred in by the contracting officer, the legal advisor, the chairman of the CARP, and the cost negotiator.

40. Mr. Mills decided to award the contract under RFP 4175 to Weidlinger. Mr. Lloyd announced the proposed award to Weidlinger by notice dated August 19, 1985.

41. NKF filed a protest of the proposed award to Weidlinger Associates with the General Accounting Office (GAO) in a letter dated August 26, 1985.

42. GAO denied the protest of NKF by decision B–220007 dated December 9, 1985. GAO held that the statements by two procurement officials that Mr. Park knew the relative strengths and weaknesses of competing firms established a reasonable basis for the agency to determine that NKF probably received an unfair advantage by its hiring of Mr. Park which justified the decision to exclude NKF's proposal from further consideration. As the GAO decision phrased it, the guiding principle in assessing the contracting agency's action was "whether there was a reasonable basis for the agency's judgment that the likelihood of an actual conflict of interest or impropriety warranted excluding an offeror."

GAO also held that the agency was not required to refer the decision to exclude NKF to the Small Business Administration since this did not involve a question of NKF's capability or other traditional elements of responsibility.

43. On December 10, 1985, plaintiff instituted the instant action.

44. NKF will be severely injured by the loss of the contract to be awarded under RFP 4175 because of its inability to continue to work for the Government in this area, the substantial reduction in employees that will be required, and the loss of competitive position. NKF's work with NAVSEA constitutes 80 percent of the company's business.

45. Absent injunctive relief, NKF would be irreparably damaged and an action at law would be unavailing because NKF could only recoup bid preparation costs and

not anticipated profits in a suit for damages.

46. Should injunctive relief be otherwise warranted in this case, public policy considerations would not preclude the granting of such relief. The services contemplated under the procurement in question are presently being provided to NAVSEA by NKF (the incumbent); hence consideration of national defense or national security would not support withholding injunctive relief.

47. Contemporaneous factors relevant to NKF's disqualification for award which Mr. Mills did not consider in his decision include the following:

(a) that Amendment 5 to RFP 4175 was added to the statement of work after Mr. Park's departure from the Government,

(b) that Amendment 5 to RFP 4175 signified much more than a simple shift in emphasis. Rather, from NAVSEA's own point of view, RFP 4175 required "significant modification" in order to accommodate a "major increase of work in the 55X2 Division" that had not been planned for in the initial request for proposals. As the TERP chairman's memorandum of December 19, 1984 explains, expansion of the RFP's "Technical Areas" would be necessary "[i]n order to provide equal weighting of effort between 55X1 and 55X2 * * *",

(c) that Weidlinger perceived Amendment 5 to RFP 4175 as requiring "a massive rewrite of the technical proposal, which in turn required * * * adding new subcontractors, and a complete recosting of the proposal",

(d) that as a contractor of long standing with NAVSEA and as the incumbent contractor for the services contemplated by RFP 4175, NKF could reasonably have been expected to gauge with a fair degree of accuracy the actual magnitude of the shift in NAVSEA's need for engineering effort that was encompassed by the redefinition of requirements stated in Amendment 5,

(e) that NKF's best and final offer, if evaluated by the technical/cost weighting formula in place during Mr. Park's tenure with NAVSEA, would have resulted in a ranking that favored Weidlinger and not NKF,

(f) that whereas Mr. Park had been told that NKF's original cost proposal was approximately $2.5 million higher than Weidlinger's cost proposal, NKF's final cost proposal was approximately $2.4 million dollars lower than Weidlinger's final cost proposal, and

(g) that although Mr. Park had responsibility for the technical aspects of RFP 4175, Weidlinger outranked NKF in the technical aspects of RFP 4175 in both the initial round of proposals as well as in the best and final offers.

48. The court, having carefully examined all of the evidence in the case and having had full opportunity to observe the demeanor of all of the witnesses, concludes as a further finding of fact that the preparation and submission of NKF's best and final offer was accomplished without the improper benefit of any "inside" information from Mr. Yip Park. The court bases this finding on the absolute conviction of integrity engendered in its mind by plaintiff's four principal witnesses—Mr. George Amir, Mr. Reuven Leopold, Ms. Karen Williams Miller, Mr. Walter A. Powers—and not on the testimony of Mr. Park.